**United States District Court**
For the Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| QUILLER BARNES, | No. C-08-4058 EMC |
| Plaintiff, | |
| v. | **ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT; AND GRANTING IN PART AND DENYING IN PART DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT** |
| AT&T PENSION BENEFIT PLAN - NONBARGAINED PROGRAM, | |
| Defendant. | |
| _____/ | **(Docket Nos. 294, 295)** |

Plaintiff Quiller Barnes has filed suit against Defendant AT&T Pension Benefit Plan, Nonbargained Program (the "Defendant Plan"), alleging that the Defendant Plan violated his rights and the rights of others similarly situated by, *inter alia*, failing to pay full pension benefits in violation of ERISA.  Currently pending before the Court are the parties' cross-motions for partial summary judgment and/or summary adjudication.  Having considered the parties' briefs and accompanying submissions, as well as the oral argument of counsel, the Court hereby **GRANTS** in part and **DENIES** in part Mr. Barnes's motion and **GRANTS** in part and **DENIES** in part the Defendant Plan's motion.

## I.    FACTUAL & PROCEDURAL BACKGROUND

Mr. Barnes is a former employee of Pacific Bell Telephone Company ("Pac Bell"), which was a subsidiary of Pacific Telesis Group ("PTG").  *See* Docket No. 298 (Holland Decl. ¶ 4).  He first retired from Pac Bell on October 29, 1996.  In 1997, SBC Communications acquired PTG.  *See*

**United States District Court**
For the Northern District of California

1  Docket No. 298 (Holland Decl. ¶ 4).  On May 1, 1997, SBC rehired Mr. Barnes.[1]  On June 25, 2004,

2  Mr. Barnes retired a second time.  The main issue in this case concerns what pension benefits Mr.

3  Barnes and others similarly situated to him should have been paid.

4  There are basically two pension plans that the Court must consider in resolving the above

5  issue: (1) the 1996 PTG Plan which was in place both at the time of Mr. Barnes's first retirement

6  and upon his rehire in 1997 and (2) the 1998 PTG Plan, whose terms applied under the SBC Plan

7  which was in place at the time of Mr. Barnes's second retirement.[2]

8  Under the 1996 PTG Plan, an employee was entitled to either a "cash balance benefit" (§ 4 *et*

9  *seq.* of the plan) or an "accelerated transition benefit" ("ATB") (§ 5 *et seq.* of the plan), whichever

10  was greater.  *See* Docket No. 104 (1996 PTG Plan § 3.2(a)).  The pension benefit that Mr. Barnes

11  received upon his first retirement was an ATB.  The ATB was discounted because Mr. Barnes had

12  not attained a certain age and certain years of service.  Mr. Barnes had the option of taking the ATB

13  as a lump sum payment or as a monthly annuity.  Mr. Barnes elected to take the ATB as a lump sum

14  payment.

15  When Mr. Barnes was rehired in 1997, the terms of the 1996 PTG Plan were still in place.

16  Section 3.4 of the 1996 PTG Plan specified in relevant part as follows:

17  If a former Employee is rehired by a Participating Company or a
   member of the Employer Group that is not a Participating Company,
18  the former Employee's right to payment of a Plan benefit will be
   suspended during the period of reemployment, subject to the
19  requirements for in-service distributions described in Section 6.4, and
   his or her Plan benefit at the Annuity Start Date following the
20  Employee's next Termination of Employment will be resumed or
   determined as follows . . . .

21  3.4(a) <u>No Prior Benefit</u>.  If the Employee has no prior accrued
22  benefit that is or becomes a Plan liability (e.g., the prior benefit was
   paid, or deemed to be paid, as a cashout payment), the Employee's

23  _____

24  [1]  In 2005, SBC acquired AT&T Corp., and SBC was renamed AT&T Inc.  *See* Docket No.
   298 (Holland Decl. ¶ 4).  Thus, the Defendant Plan in this case is a pension plan named after AT&T.

25  [2]  The 1998 PTG Plan merged into the SBC Plan in 1999.  *See* Docket No. 298 (Holland ¶ 4).
26  The SBC Plan provided that, for former PTG employees, their benefits would still be governed by
   the 1998 PTG Plan.  *See* Docket No. 299-3 (ATTP 2942) (SBC Plan, Supplement 1, § S1.5)
27  (providing that "[a]ll benefits accrued under the provisions of the PTG Plan prior to January 1, 1999
   and transferred to the [SBC Plan] effective January 1, 1999, shall continued to be governed, with
28  respect to current employees, under the provisions of the PTG Plan in effect as of December 31,
   1998").

Plan benefit at his or her next Termination of Employment will be the cash balance benefit accrued from the rehire date under Section 4.5(b).

. . . .

3.4(d) <u>Prior Benefit Based on Termination After March 21, 1996/Participation Resumed</u>. If the Employee's prior Termination of Employment occurs on or after March 22, 1996, the Employee's Plan benefit at the Annuity Start Date following the Employee's next Termination of Employment will be determined as follows:

. . . .

(3)     If the employee was receiving, or was eligible to receive, a monthly pension under the accelerated transition benefit formula at his or her prior Termination of Employment, the Employee's Plan benefit at the Annuity Start Date(s) following his or her next Termination of Employment will be equal to (x) plus (y) where:

(x) is the monthly benefit payable at the Employee's prior Termination of Employment under Section 5.1 [ATB], except that if the prior benefit was subject to an age discount under Section 5.2, and the Employee's service is bridged under Section 7.4(a), the benefit will be adjusted to reflect the Employee's age and Term of Employment under Section 7.7 at the Employee's next Termination of Employment; and

(y) is the monthly cash benefit balance under Section 4.5(b) based on allocations to the Employee's Account from the Employee's rehire date to the Annuity Start Date that applies to the cash balance benefit.

Docket No. 104 (1996 PTG Plan § 3.4).  In this litigation, the Defendant Plan has referred to the (x) plus (y) values of § 3.4(d)(3) as the "Additive Benefit."

Section 3.4 of 1998 PTG Plan does not materially differ from § 3.4 of the 1996 PTG Plan, except that § 3.4(a) of the 1998 plan provides as follows:

3.4(a) <u>No Prior Benefit</u>.  If the Employee has no prior accrued benefit that is a Plan liability (*e.g.*, the prior benefit was paid, or deemed to be paid, as a cashout payment) or becomes a Plan liability (*e.g., a Plan benefit that becomes vested after service is bridged under Section 7.4*), the Employee's Plan benefit at his or her next Termination of Employment will be the cash balance benefit accrued from the rehire date determined under Section 4.5(b).

Docket No. 107 (1998 PTG Plan § 3.4(a)) (emphasis added).  The language italicized above is language that was added to the 1998 PTG Plan and not present in the 1996 PTG Plan.

**United States District Court**

For the Northern District of California

When Mr. Barnes retired the second time, he received only a cash balance benefit.  It is Mr. Barnes's contention that, at the time of his second retirement, he was entitled to the cash benefit balance *plus* a "redetermined" ATB pursuant to § 3.4(d)(3).  According to Mr. Barnes, he was entitled to a redetermined ATB (*i.e.*, an ATB with no discount, less the amount he previously received as a lump sum payment) because, during his rehire, he bridged his prior service[3] and as a result, taking into account both his prior service and his rehire service, he reached the necessary age and years of service to reach a full (*i.e.*, nondiscounted) ATB.  In response, the Defendant Plan argues that Mr. Barnes was entitled to only a cash balance benefit because § 3.4(a) is applicable rather than § 3.4(d)(3).  The Defendant Plan interprets § 3.4(a) under the 1998 PTG Plan as being applicable to lump sum payees while § 3.4(d)(3) is applicable to annuitants, either deferred or immediate.[4]

Notably, Mr. Barnes is bringing not only an individual claim for failure to pay pension benefits owed but also a class claim (Count II).  In fact, Judge Patel has already certified that class claim.  *See* Docket Nos. 176, 240 (orders).  Initially, the class that was certified consisted only of employees who had received lump sum payments for their ATB as opposed to monthly annuities.  *See* Docket No. 176 (Order at 14).  Subsequently, however, Judge Patel granted Mr. Barnes's motion to modify the certification order.  More specifically, Judge Patel modified the class definition to include not only lump sum payees but also deferred annuitants – *i.e.*, employees who elected to be paid monthly annuities but who had not yet received any distributions.  *See* Docket No. 240 (Order at 10-11).  Mr. Barnes argues that, like lump sum payees, deferred annuitants were not paid their full pension benefits under § 3.4(d)(3).  More specifically, while deferred annuitants *were* paid a redetermined ATB, they were *not* paid, in addition, a cash balance benefit.  In other words, lump sum payees were paid the "y" but not the "x" of § 3.4(d)(3) while deferred annuitants were paid the "x" but not the "y"; neither were paid "x" plus "y."

---

[3]  *See* Docket No. 105 (1996 PTG Plan § 7.4(a)) (providing that "[s]ervice prior to . . . absences is included in a Participant's Term of Employment" under certain conditions); Docket No. 108 (1998 PTG Plan § 7.4(a)) (same).

[4]  As discussed *infra*, the Defendant Plan has consistently interpreted § 3.4(a) as being applicable to lump sum payees.  However, the Defendant Plan's interpretation of § 3.4(d)(3) has changed during the course of this litigation.

**United States District Court**
For the Northern District of California

1    While the claim for failure to pay pension benefits (Count II) is the main claim in the case,

2 there are two additional claims that are at issue with the parties' cross-motions for partial summary

3 judgment: Counts I and V.  Count I is an individual claim only.  In this claim, Mr. Barnes alleges

4 that the Defendant Plan failed to provide him with adequate notice as to the specific reasons why it

5 denied his claim for benefits.  Count V is an individual and a class claim (as of date, uncertified).

6 *See* Docket No. 240 (Order at 14 n.6).  In this claim, Mr. Barnes alleges that, under the SBC Plan, "a

7 participant employed . . . on January 1, 1999, who has accrued a right to an [ATB] under the PTG

8 Pension Plan was entitled to receive an alternative CB [cash balance] benefit called the Special

9 ATB."  Docket No. 243 (SAC ¶ 180); *see also* Docket No. 299-3 (ATTP 2943) (SBC Plan,

10 Supplement 1, § S1.7) (providing for the Special ATB).  Each of the claims – *i.e.*, Counts I, II, and V

11 – is addressed below.[5]

## II.  DISCUSSION

12

13 A.    Legal Standard

14    Federal Rule of Civil Procedure 56(c) provides that summary judgment shall be rendered "if

15 the pleadings, depositions, answers to interrogatories, and admissions on file, together with the

16 affidavits, if any, show that there is no genuine issue as to any material fact and that the moving

17 party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  An issue of fact is genuine

18 only if there is sufficient evidence for a reasonable jury to find for the nonmoving party.  *See*

19 *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986).  "The mere existence of a scintilla of

20 evidence . . . will be insufficient; there must be evidence on which the jury could reasonably find for

21 the [nonmoving party]."  *Id.* at 252.  At the summary judgment stage, evidence must be viewed in

22 the light most favorable to the nonmoving party and all justifiable inferences are to be drawn in the

23 nonmovant's favor.  *See id.* at 255.

24    Where the plaintiff has the ultimate burden of proof, he or she may prevail on a motion for

25 summary judgment only if he or she affirmatively demonstrates that there is no genuine dispute as to

26

27 _____

[5]  The counts not at issue with the pending motions for partial summary judgment are Counts III and IV.  Basically, in these counts, Mr. Barnes contends that, if the Defendant Plan's interpretation of §§ 3.4(a) and 3.4(d)(3) is correct, then the Defendant Plan violates ERISA's anti-cutback, anti-forfeiture, and actuarial equivalence requirements.

28

every essential element of its claim.  *See River City Mkts., Inc. v. Fleming Foods W., Inc.*, 960 F.2d 1458, 1462 (9th Cir. 1992).  In contrast, where the plaintiff has the ultimate burden of proof, the defendant may prevail on a motion for summary judgment simply by pointing to the plaintiff's failure "to make a showing sufficient to establish the existence of an element essential to [the plaintiff's] case."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

In the instant case, both parties are moving for summary judgment on Counts I and II of the SAC – *i.e.*, the individual claim for failure to provide adequate notice and the class claim for failure to pay full pension benefits.  In addition, the Defendant Plan is moving for summary judgment on Count V, which relates to the Special ATB.  Finally, Mr. Barnes is moving for summary adjudication as to the proper standard of review applicable to the Defendant Plan's decision to deny benefits (Count II).

B.   Count I – Failure to Provide Adequate Notice

In Count I (an individual claim only), Mr. Barnes asserts that the Defendant Plan failed to give him adequate notice of the specific reasons for denying his claim, both in violation of ERISA and its implementing regulations.

ERISA § 503 provides as follows:

> In accordance with regulations of the Secretary, every employee benefit plan shall –
>
> (1)   provide adequate notice in writing to any participant or beneficiary whose claim for benefits under the plan has been denied, setting forth the specific reasons for such denial, written in a manner calculated to be understood by the participant, and
>
> (2)   afford a reasonable opportunity to any participant whose claim for benefits has been denied for a full and fair review by the appropriate named fiduciary of the decision denying the claim.

29 U.S.C. § 1133.  Title 29 C.F.R. §§ 2560.503-1(g) and (j) expand upon what is required in a notice of decision.  More specifically, under the regulation, a notice of decision must

> set forth, in a manner calculated to be understood by the claimant –
> (i)   The specific reason or reasons for the adverse determination; [and]
>
> (ii)   Reference to the specific plan provisions on which the determination is based . . . .

United States District Court

For the Northern District of California

1   29 C.F.R. § 2560.503-1(g); *see also id.* § 2560.503-1(j) (providing for the same).

2          In the instant case, Mr. Barnes argues that the Defendant Plan failed to comply with § 1133

3   and its implementing regulation because, in both its notice denying the claim and then the notice

4   denying the appeal, the Defendant Plan failed to refer to any specific plan provision on which its

5   determination was based.  Mr. Barnes acknowledges that the notices did refer to sections from a

6   "Benefits Binder" (also known as the "Summary Plan Description" or "SPD") but argues that these

7   references were inadequate because the "Benefits Binder" is not the same thing as the Plan.  *See*

8   Docket No. 298 (Holland Decl., Ex. A.10) (ATTP 3579 *et seq.*) (initial denial); Docket No. 298

9   (Holland Decl., Ex. A.10) (ATTP 3470 *et seq.*) (denial of appeal).

10         In evaluating this argument, the Court should begin by taking note that, under Ninth Circuit

11  law, only substantial compliance with ERISA's notice requirements is required.[6]  *See Chuck v.*

12  *Hewlett Packard Co.*, 455 F.3d 1026, 1032 (9th Cir. 2006) (noting that "substantial compliance with

13  these requirements [*i.e.*, § 1133 and its implementing regulation] is sufficient"); *see also Wenner v.*

14  *Sun Life Assur. Co.*, 482 F.3d 878, 882 (6th Cir. 2007) (stating that "[t]his circuit applies a

15  'substantial compliance' test to determine whether § 1133's notice requirements have been met").

16  *See, e.g.*, *White v. Aetna Life Ins. Co.*, 210 F.3d 412, 417 (D.C. Cir. 2000) (explaining that, "where,

17  _____

18          [6] To the extent Mr. Barnes argues that a notice *must* include a reference to the plan
    provisions, he fails to take into account the Ninth Circuit's substantial compliance rule.  *White v.*
    *Jacobs Engineering Group Long Term Disability Benefit Plan*, 896 F.2d 344 (9th Cir. 1989), the

19  case which Mr. Barnes cites, is not to the contrary.  There, the plan administrator denied the
    plaintiff's claim for long-term disability benefits because he did not meet the plan's definition of

20  total disability.  According to the administrator, "'information in [its] file' indicated that [the
    plaintiff] was engaged in gainful employment."  *Id.* at 347.  The Ninth Circuit held that ERISA's

21  notice requirements were not met because the administrator's notice simply "offered an unsupported
    conclusion regarding ineligibility for benefits, citing only 'information in our files' that [the

22  plaintiff] was 'gainfully employed.'"  *Id.* at 350.  The court then went on to note:

23          The letter also failed to cite specifically the pertinent plan provisions
            on which the denial was based, as is required by 29 C.F.R. §

24          2560.503-1(f)(2).  "Without a citation to the Plan provisions,
            plaintiff[] had no opportunity to comprehend fully the reason for the

25          denials and to know what deficiencies [his application] must overcome
            to be successful on appeal."  Nor did the letter adequately inform the

26          appellant of the type of information he should submit to perfect his
            claim, as is mandated by 29 C.F.R. § 2560.503-1(f)(3).

27  *Id.*  Thus, it appears that the Ninth Circuit found fault with the failure to cite to the plan provisions
    only because of the specific circumstances.  The Ninth Circuit did not hold that, as a general rule, a

28  failure to cite to a plan provision constitutes an ERISA violation.

United States District Court

For the Northern District of California

as here, the reason for denial has no connection to any particular plan provision, failure to reference a specific provision seems just the type of technical noncompliance that the substantial compliance test excuses").

In *Donato v. Metropolitan Life Ins. Co.*, 19 F.3d 375 (7th Cir. 1994), *overruled in part on other grounds by Diaz v. Prudential Ins. Co. of Am.*, 424 F.3d 635, 640 (7th Cir. 2005), the Seventh Circuit held that, "[i]n determining whether there has been substantial compliance, the purpose of 29 U.S.C. § 1133 and its implementing regulations . . . serves as [a court's] guide." *Id.* at 382.  The Ninth Circuit has indicated agreement with this approach.  *See Brogan v. Holland*, 105 F.3d 158, 165 (9th Cir. 1997).  It is well established that the purpose of § 1133 and its implementing regulation "is to permit the claimant to adequately prepare an appeal to the federal courts and for those courts to properly review the decision."  *Ellis v. Metropolitan Life Ins. Co.*, 126 F.3d 228, 238 (4th Cir. 1997), *abrogated in part on other grounds as stated in DuPerry v. Life Ins. Co. of N. Am.*, 632 F.3d 860, 869 (4th Cir. 2011); *see also Donato*, 19 F.3d at 382 (asking "'was the beneficiary supplied with a statement of reasons that, under the circumstances of the case, permitted a sufficiently clear understanding of the administrator's position to permit effective review'"); *Brogan*, 105 F.3d at 165 (asking the same).  As the Seventh Circuit has noted, depending on the circumstances, a failure to cite to the specific plan provision on which a decision is based may well affect the ability of a claimant to adequately appeal.  *See Wolfe v. J.C. Penney Co.*, 710 F.2d 388, 392 (7th Cir. 1983) (stating that "[t]he . . . requirement of specifying the pertinent plan provision may be, *in a particular case*, essential for the participant to fully apprehend the reason for the denial and to know what deficiency in his application must be overcome") (emphasis added), *abrogated on other grounds by Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989).

In the instant case, the Court agrees with Mr. Barnes that there was a violation of ERISA's notice requirements.  Admittedly, both the Defendant Plan's initial denial and its denial of the appeal provided specific reasons for the rejection of Mr. Barnes's claim for benefits – *i.e.*, because Mr. Barnes had taken a cashout of his ATB at the time of his first retirement, future benefits upon rehire would not "re-do" his ATB.  *See, e.g.*, Docket No. 298 (Holland Decl., Ex. A.10) (ATTP 3580) (initial denial) (quoting Benefits Binder provision stating that, "'[i]f you took a cashout of the

**United States District Court**

For the Northern District of California

1   [ATB], it will be disregarded for future pension benefits'"); Docket No. 298 (Holland Decl., Ex.

2   A.10) (ATTP 3471) (denial of appeal) (quoting the same).  However, it is hard to say that this

3   information was enough for Mr. Barnes to effectively appeal because, without knowing at the very

4   least what § 3.4(a) said (either the precise language or a very close paraphrase), *see, e.g.*, *Bojorquez*

5   *v. E.F. Johnson Co.*, 315 F. Supp. 2d 1368, 1373 (S.D. Fla. 2004) (stating that "[t]he letter's

6   inclusion of the precise language that served as the basis of Unum's decision pinpointed the issues

7   Plaintiff would have to address on appeal"), he could not challenge the Defendant Plan's

8   interpretation that his prior cashout of the ATB barred any claim for a redetermined ATB.  *Cf. Neal*

9   *v. Christopher & Banks Comprehensive Maj. Med. Plan*, 651 F. Supp. 2d 890, 901 (E.D. Wisc.

10  2009) (finding a violation of ERISA's notice requirements because, even though the claimant was

11  told that the kidney/liver transplant was not medically necessary, "[w]ithout the narrower definition

12  of the phrase 'medically necessary' contained in the Plan and some reference to the six-month

13  abstinence requirement, the idea that this life-saving surgical transplant was not necessary made no

14  sense").  The references to the Benefits Binder were not sufficient as the Benefits Binder did not use

15  the same exact language or a close approximation thereto as the Plan.  Moreover, it is possible that,

16  had the Defendant Plan cited to § 3.4(a), that would have led Mr. Barnes to § 3.4(d)(3), which is the

17  basis for his claim to benefits in this litigation.

18          As the Court does find a violation of ERISA's notice requirements, the next question is what

19  remedy the Court should provide.  The Ninth Circuit has stated that "the usual remedy for a

20  violation of § 1133 is 'to remand to the plan administrator so the claimant gets the benefit of a full

21  and fair review.'"  *Chuck*, 455 F.3d at 1035.  But a remand here seems essentially pointless because

22  it is now clear – if only through this litigation – that § 3.4(a) is the provision upon which the

23  Defendant Plan relied.  *See, e.g.*, *Ellis*, 126 F.3d at 238 (noting that "it would be pointless for us to

24  vacate the decision below and remand with instructions to the lower court that it should, in turn,

25  remand this matter to MetLife with instructions that it provide [the plaintiff] with the specific

26  reasons for its continued denial, since those reasons are now apparent to all"); *see also McCartha v.*

27  *National City Corp.*, 419 F.3d 437, 447 (6th Cir. 2005) (finding that "a remand would be a 'useless

28  formality'" because, even though "the Disability Plan failed to provide [the plaintiff] with one of the

1    specific reasons for terminating her benefits," it "still provided a reasonable basis for denying her

2    benefits – her refusal to comply with her treatment plan").

3         Accordingly, the Court grants Mr. Barnes summary judgment on Count I but finds that the

4    normal remedy of remand would be a useless formality, and therefore Mr. Barnes is not entitled to

5    any real relief.  To the extent Mr. Barnes argues that the procedural violation of § 1133 and its

6    implementing regulation informs the standard of review for Count II, *see* Mot. at 15, that is

7    addressed below.

8    C.   Count II – Failure to Pay Full Pension Benefits

9         As noted above, Count II – which is the claim for the failure to pay full pension benefits – is

10   a class claim.  In fact, Judge Patel has already certified a class for this claim.  To resolve this claim,

11   the Court must first consider what is the appropriate standard of review with respect to the

12   Defendant Plan's decision to deny benefits.  Mr. Barnes, however, has also taken the position that,

13   regardless of the standard of review applied – *i.e.*, de novo, pure abuse of discretion, or abuse of

14   discretion tempered with skepticism – he is entitled to summary judgment.

15        1.   Standard of Review

16        As noted above, there are essentially three possible standards of review that may be applied

17   with respect to an ERISA plan's decision to deny benefits: de novo, pure abuse of discretion, or

18   abuse of discretion tempered with skepticism.  As a starting point,

19            [t]he Supreme Court has held that a denial of benefits "is to be
             reviewed under a de novo standard *unless* the benefit plan gives the
20           administrator or fiduciary discretionary authority to determine
             eligibility for benefits or to construe the terms of the plan."  When a
21           plan unambiguously gives the plan administrator discretion to
             determine eligibility or construe the plan's terms, a deferential abuse
22           of discretion standard is applicable.

23   *Burke v. Pitney Bowes Inc. Long-Term Disability Plan*, 544 F.3d 1016, 1024 (9th Cir. 2008)

24   (emphasis added).

25        The abuse-of-discretion standard, however, is subject to some modification.  That is, where

26   there is a conflict of interest – *e.g.*, because the plan administrator both funds and evaluates the

27   claim, *see id.* – then a court "'must determine the extent to which the conflict influenced the

28   administrator's decision and discount to that extent the deference [the court] accord[s] the

United States District Court
For the Northern District of California

**United States District Court**

For the Northern District of California

1   administrator's decision.'" *Salomaa v. Honda Long Term Disability Plan*, 637 F.3d 958, 966 (9th

2   Cir. 2011). This standard is known as abuse of discretion tempered with skepticism. *See, e.g.*,

3   *Nolan v. Heald College*, 551 F.3d 1148, 1155 (9th Cir. 2009) (noting that, "had the district court

4   applied a different standard of review because of the bias evidence – abuse of discretion tempered

5   with skepticism as opposed to abuse of discretion tempered with no skepticism – its decision on the

6   merits of the underlying benefits decision may have been different").

7         In the instant case, there is no dispute that the 1996 and 1998 PTG Plans unambiguously

8   grant the Benefit Plan Commitee ("BPC") the discretion to construe each Plan's terms. Both the

9   1996 and the 1998 PTG Plan provide:

10            The Committee, acting in its absolute discretion, shall have the duty
              and authority to interpret and construe the provisions of the Plan and
11            to decide all questions which may arise or which may be raised under
              the Plan by any Employee, Participant, former Participants,
12            beneficiary or any other person, including but not limited to all
              questions relating to . . . the amount of benefits to which any
13            Participant or his or her beneficiary may be entitled.

14   Docket No. 106 (1996 PTG Plan § 12.2(a)); Docket No. 109 (1998 PTG Plan § 12.2(a)). In light of

15   the above provision, the Defendant Plan argues that the Court should review its decision to deny

16   benefits for an abuse of discretion.

17         Nevertheless, Mr. Barnes argues that, there are circumstances here which should lead the

18   Court either to strip the Defendant Plan of all deference and apply de novo review or at the very

19   least to apply a heightened abuse of discretion standard, *i.e.*, abuse of discretion tempered with a

20   healthy amount of skepticism. Although Mr. Barnes presents various arguments as to why there

21   should be de novo or heightened review, his main argument is that deference should either be

22   stripped or markedly downgraded due to the Defendant Plan's multiple interpretations of the Plan.

23   Because this is Mr. Barnes's main argument, the Court briefly discusses what those multiple

24   interpretations are and the circumstances regarding those interpretations. The Court takes into

25   account the Defendant Plan's contention that it should not be charged with all of the interpretations

26   – more specifically, all of the interpretations of § 3.4(d)(3).

27   ///

28   ///

United States District Court

For the Northern District of California

2.   Interpretations of §§ 3.4(a) and 3.4(d)(3)

a.   Sole Interpretation of § 3.4(a)

As Mr. Barnes points out, in both its initial denial and denial of the appeal, the Defendant Plan failed to cite to any specific provision of the Plan as the basis for its decision. Nevertheless, that does not mean, as Mr. Barnes suggests, that the Defendant Plan failed to ever interpret the Plan. The administrative record includes an internal BPC memorandum, which was the basis for the denial of the appeal. In that memorandum, § 3.4(a) is not only cited but also quoted in full. *See* Docket No. 298 (Holland Decl., Ex. A.10) (ATTP 3474) (BPC memo). There is also a copy of § 3.4(a) in the administrative record. *See* Docket No. 298 (Holland Decl., Ex. A.10) (ATTP 3669) (excerpt of § 3.4). Thus, it is clear that the Defendant Plan did interpret the Plan – more specifically, § 3.4(a) – before deciding to deny Mr. Barnes's claim for benefits.

With respect to § 3.4(a), the Defendant Plan has always taken the same basic interpretation – *i.e.*, that it is applicable to lump sum payees and therefore lump sum payees are entitled to only a cash balance benefit, and not a cash balance benefit plus an ATB. The Defendant Plan has never departed from this interpretation.

b.   Multiple Interpretations of § 3.4(d)(3)

The situation is a little more complicated with respect to § 3.4(d)(3), the provision that Mr. Barnes claims controls instead of § 3.4(a). Section 3.4(d)(3) was never interpreted by the Defendant Plan (including the BPC) at any time during the administrative proceedings. To the extent Mr. Barnes suggests that it should have been, that argument is not convincing. There was no real need for the Defendant Plan to interpret § 3.4(d)(3) during the administrative proceedings because, so long as it believed § 3.4(a) applied (*i.e.*, "No Prior Benefit"), then none of § 3.4(d) could apply (*i.e.*, "Prior Benefit Based on Termination After March 21, 1996/Participation Resumed"). *Compare Vincent v. Lucent Techs., Inc.*, 733 F. Supp. 2d 729, 736 (W.D.N.C. 2010) (finding committee's failure to interpret § 6.6 of the plan problematic but only because the committee cited § 4.1(a)(ii) in denying claimant's second appeal and "Section 4.1(a)(ii)'s language explicitly mentions two exceptions; Section 6.4(a)(i)(1) and Section 6.6").

United States District Court

For the Northern District of California

The first time that § 3.4(d)(3) became an issue was with this litigation.  Notably, Mr. Barnes did not bring up § 3.4(d)(3) at the outset of the lawsuit, *i.e.*, when he filed his complaint in January 2008.  Rather, the first time that he raised § 3.4(d)(3) as an issue was on January 26, 2010, when he moved to file an amended complaint.  *See* Docket No. 39 (Proposed SAC ¶ 50).  Thus, the Defendant Plan was not put on specific notice about § 3.4(d)(3) until two years into the action.

i.      First Interpretation of § 3.4(d)(3)

On March 1, 2010, Mr. Barnes brought up § 3.4(d)(3) again, this time in opposition to a motion for summary judgment.  *See* Docket No. 73 (Opp'n at 2).  In its reply in support of the motion, filed on March 15, 2010, the Defendant Plan provided for the first time its interpretation of the Plan provision.

This interpretation was *not* offered by the BPC, the entity formally charged with interpretation by the Plan.  Nor is there any indication that the BPC signed off on or otherwise considered this interpretation.  The interpretation, however, was the one formally articulated by the Defendant Plan as a part of this litigation and was supported by a declaration from Hannah Francis, the Director of Benefits for AT&T Services, Inc.

The Defendant Plan's first interpretation was that § 3.4(d)(3) applied to annuitants only, and not lump sum payees.  *See* Docket No. 88 (Reply at 6) (claiming that § 3.4(d)(3) was irrelevant because it applied to "rehired employees who took their ATB as an annuity, had it suspended during the term of their subsequent employment, and then had it recalculated to reflect their additional age plus years of service after the end of their subsequent employment").  Notably, the Defendant Plan indicated that the provision applied both to immediate annuitants *and* deferred annuitants.  As noted above, Ms. Francis, the Director of Benefits for AT&T Services, Inc., provided a supporting declaration in which she stated:

> [U]nder subsection 3.4(d)(3), Employees who were receiving a monthly ATB annuity (*or* were eligible to receive a monthly ATB annuity but had not yet commenced its distribution) will have the annuity redetermined [*i.e.*, the (x) value] based on their additional years of service and age, assuming that their service has been bridged under Section 7.4.  Such employees will also receive a monthly cash balance benefit [*i.e.*, the (y) value] accrued from the date of the Employee's rehire if hired prior to the conversion from cash balance to the CAM benefit formula . . . .

United States District Court

For the Northern District of California

1    Docket No. 86 (Hannah Decl. ¶ 4) (emphasis added).

2         Ultimately, Judge Patel made no ruling on the Defendant Plan's motion for summary

3    judgment, apparently because Mr. Barnes was given leave to amend his complaint. *See* Docket No.

4    131 (civil minutes) (indicating that the motion for summary judgment was being held in abeyance).

5                    ii.    Second Interpretation of § 3.4(d)(3)

6         Although Ms. Francis testified in her declaration that § 3.4(d)(3) was applicable to both

7    immediate *and* deferred annuitants, she testified completely differently when she was deposed as a

8    30(b)(6) witness several months later in November 2010. During the deposition, she indicated that §

9    3.4(d)(3) applied only to immediate annuitants and *not* deferred. *See* Docket No. 292 (Swanson

10   Decl., Ex. E) (Francis Depo. at 63-64, 66, 688) (testifying that "[t]he interpretation of . . . 3.4(d)(3)

11   is only to provide the redetermined ATB plus the cash balance where the employee had previously

12   commenced the ATB benefit" and that deferred annuitants are not entitled to the benefits described

13   under § 3.4(d)(3)). Deferred annuitants, according to Ms. Francis, would get only an ATB. *See*

14   Docket No. 292 (Swanson Decl., Ex. E) (Francis Depo. at 63). It does not appear that the Defendant

15   Plan ever corrected Ms. Francis's deposition testimony.

16        Based on Ms. Francis's testimony, Mr. Barnes moved to amend the class certification order

17   to include deferred annuitants – and not just lump sum payees – in the class.[7] *See* Docket No. 199

18   (motion). At the hearing on the motion, Mr. Barnes asserted that § 3.4(d)(3) should cover both lump

19   sum payees and deferred annuitants – *i.e.*, lump sum payees as well as deferred annuitants were

20   entitled to both the (x) and (y) values under § 3.4(d)(3), but lump sum payees were being deprived

21   of the (x) value and deferred annuitants were being deprived of the (y) value. *See* Docket No. 245

22   (Tr. at 19). At the hearing, Defense counsel confirmed that "[d]eferred annuitants, according to the

23   plan operation manager [presumably, Ms. Francis], would not get the cash balance [*i.e.*, the (y)] on

24   the second termination." Docket No. 245 (Tr. at 26).

25        Ultimately, on March 1, 2011, Judge Patel granted Mr. Barnes's motion to amend and

26   included deferred annuitants in the class. *See* Docket No. 240 (Order at 8).

27   _____

28        [7] Previously, Judge Patel had agreed with the Defendant Plan that the class definition should
     exclude all annuitants. *See* Docket No. 176 (Order at 12).

iii.    Third and Final Interpretation of § 3.4(d)(3)

On August 31, 2011 – approximately six months after Judge Patel's order – the Defendant Plan submitted its third interpretation of § 3.4(d)(3).  *See* Docket No. 292 (Swanson Decl., Ex. A) (ATTP 4189 *et seq.*) (BPC memo).  This interpretation was the first interpretation actually made by the BPC specifically, *i.e.*, the entity with the sole authority to interpret under the terms of the Plan.  With this third and final interpretation, the BPC essentially offered the same interpretation as the first interpretation above.  That is, the BPC concluded – as Ms. Francis originally had – that § 3.4(d)(3) applies to all annuitants, both immediate and deferred.  *See* Docket No. 292 (Swanson Decl., Ex. A) (ATTP 4194) (stating that "Section 3.49d)(3) of the 1996 PTG Plan applies to immediate or deferred annuitants and these participants are eligible to receive '(x) plus (y) in connection with their second termination of employment").

3.    De Novo Review

In his papers, Mr. Barnes argues that the Court should apply de novo review because (1) the Defendant Plan never interpreted the plan – *i.e.*, it never exercised its discretion in the first place – and (2) the Defendant Plan offered multiple interpretations of the plan.

The first argument is without merit.  As noted above, § 3.4(a) is specifically cited and quoted in the internal BPC memo.  Moreover, a copy of § 3.4(a) is a part of the administrative record.  Thus, it is clear that the Defendant Plan did interpret the Plan in deciding to deny Mr. Barnes benefits.

The second argument is also lacking in merit.  Mr. Barnes correctly points out that, in *Conkright v. Frommert*, 130 S. Ct. 1640 (2010), the Supreme Court stated: "Multiple erroneous interpretations of the same plan provision, even if issued in good faith, might well support a finding that a plan administrator is too incompetent to exercise his discretion fairly . . . ."  *Id.* at 1651.  But, in the instant case, there are no specific interpretations of the Plan that have been deemed erroneous, either by this Court or by Judge Patel.[8]  Furthermore, the inconsistencies here were limited to the

---

[8]  In her order granting Mr. Barnes's motion to modify the class certification order, Judge Patel did "engage in some construction of the language of section 3.4(d)(3)" but it appears that she did so "only for the purpose of determining whether the inclusion of deferred annuitants [and not just lump sum payees] comports with Rule 23."  Docket No. 240 (Order at 7).  Judge Patel did not make any final ruling as to how § 3.4(d)(3) should be interpreted.

1    question of whether deferred annuitants were entitled to the benefit of § 3.4(d); Defendants have

2    been consistent in their interpretation as to lump sum payees.  Moreover, the first and third

3    interpretations were to annuitants' benefit.  As discussed in greater detail below, there is no

4    sufficient demonstration of bad faith or incompetence in this regard to warrant de novo review.

5          Finally, to the extent Mr. Barnes suggests de novo review is warranted based on procedural

6    violations, the Court does not agree.  Under Ninth Circuit law, the standard of review reverts back to

7    de novo only if the plan administrator commits "wholesale and flagrant violations of the procedural

8    requirements of ERISA." *Abatie v. Alta Health & Life Ins. Co.*, 458 F.3d 955, 971 (9th Cir. 2006).

9    The procedural violations suggested by Mr. Barnes are not "'so flagrant as to alter the substantive

10   relationship between the employer and employee, thereby causing the beneficiary substantive

11   harm.'" *Id.*

12         For example, although the Defendant Plan failed to cite to § 3.4(a) in its notices of decision,

13   the substantive harm to Mr. Barnes appears minimal at best because, as discussed above, it is clear –

14   if only through this litigation – that § 3.4(a) was the basis for the denial of benefits.

15         As for the Defendant Plan's failure to decide his claim for benefits within the regulatory

16   deadline, it too does not appear to have caused Mr. Barnes any real substantive harm.  Under 29

17   C.F.R. § 2560.503-1, a plan administrator has 90 days to decide the initial claim and 60 days to

18   decide an appeal.  *See* 29 C.F.R. § 2560.503-1(f)(1), (i)(1).  A plan administrator may extend the

19   time to decide (by 90 and 60 days respectively) if there are special circumstances but the notice of

20   extension must be timely made and must indicate the special circumstances that require an extension

21   of time.  *See id.*

22   •    In the instant case, Mr. Barnes submitted his initial claim for benefits on March 5, 2004.  *See*

23        Docket No. 99 (letter).  On August 6, 2004, the Defendant Plan stated that it needed an

24        additional 90 days "to research and respond to [the] claim."  *See* Docket No. 100 (letter).

25        Ultimately, the Defendant Plan denied the claim slightly more than 90 days later (*i.e.*, on

26        November 11, 2004).  *See* Docket No. 298 (Holland Decl., Ex. A.10) (ATTP 3579) (initial

27        denial).

28

United States District Court

For the Northern District of California

- As for the appeal, Mr. Barnes submitted the appeal on January 18, 2005. *See* Docket No. 298 (Holland Decl., Ex. A.10) (ATTP 3652) (appeal). More than 60 days later (*i.e.*, on March 29, 2005), the Defendant Plan stated that it needed an additional 60 days "to complete [the] review." Docket No. 298 (Holland Decl., Ex. A.10) (ATTP 3655) (letter). The Defendant Plan ultimately denied the appeal on April 26, 2005. *See* Docket No. 298 (Holland Decl., Ex. A.10) (ATTP 3470) (denial of appeal).

As indicated by the above, the Defendant Plan does seem to have violated § 2560.503-1(f)(1) and (i)(1). But even if that were true, that only means that the Defendant Plan was late in deciding the initial claim by about 90 days and the appeal by about 40 days. It is hard to see how this kind of delay caused Mr. Barnes any substantive harm. Moreover, in *Abatie*, the Ninth Circuit stated that, "[w]hen an administrator can show that it has engaged in an ongoing, good faith exchange of information between the administrator and the claimant, the court should give the administrator's decision broad deference notwithstanding a minor irregularity." *Abatie*, 458 F.3d at 972 (internal quotation marks omitted). *Jebian v. Hewlett-Packard Co. Employee Benefits Organization Income Protection Plan*, 349 F.3d 1098 (9th Cir. 2003), is distinguishable because there, an ongoing, good faith exchange was clearly lacking – *e.g.*, the plan administrator failed to decide appeal within 60 days, failed to inform claimant that because of special circumstances it needed an additional 60 days, and ultimately did not request any further information from claimant "until the 119th day, one day short of the 120-day." *Id.* at 1107.

4.    Abuse of Discretion

Mr. Barnes argues that, even if the Court declines to apply de novo review, the review for abuse of discretion must be tempered with skepticism. Mr. Barnes argues for this heightened review because Defendant Plan has a structural conflict of interest and the conflict of interest likely informed the decision to deny benefits.

There does not appear to be any real dispute that there is a structural conflict of interest in the instant case because the BPC consists of employees of the entity which funds the Plan. *See Burke*, 544 F.3d at 1024 (taking note that a conflict of interest exists where a plan administrator acts as both the funding source and administrator of the plan or where an employer both funds and evaluates the

1    claims). Furthermore, there appears to be no dispute that such a conflict of interest must be taken

2    into account as a factor in determining whether an abuse of discretion occurred. *See id.* The

3    question for the Court is how much weight, if any, to give the conflict of interest here.

4         The Ninth Circuit has emphasized that a conflict is "'but one factor among many that a

5    reviewing judge must take into account.'" *Id.* at 1025. The court has further indicated that a conflict

6    of interest will have more importance "'where circumstances suggest a higher likelihood that it

7    affected the benefits decision," *id.* at 1025 – *e.g.*, where an administrator provides inconsistent

8    reasons for denial, fails adequately to investigate the claim or ask the claimant for necessary

9    evidence, fails to credit the claimant's reliable evidence, or has repeatedly denied benefits to

10   deserving benefits by interpreting plan terms incorrectly or by making decisions against the weight

11   of evidence in the record. *See Abatie*, 458 F.3d at 968-69. In contrast, a conflict of interest will

12   have less importance "'where the administrator has taken active steps to reduce potential bias and to

13   promote accuracy, for example, by walling off claims administrators from those interested in firm

14   finances, or by imposing management checks that penalize inaccurate decisionmaking irrespective

15   of whom the inaccuracy benefits.'" *Burke*, 544 F.3d at 1025. A conflict will also have less

16   importance if, *e.g.*, there is no evidence of malice, self-dealing, or a parsimonious claims-granting

17   history. *See Abatie*, 458 F.3d at 968; *see also Conkright*, 130 S. Ct. at 1648 (noting that "the lower

18   courts made no finding that the Plan Administrator had acted in bad faith or would not fairly

19   exercise his discretion to interpret the terms of the Plan").

20        According to Mr. Barnes, it is likely that the Defendant Plan's conflict of interest affected its

21   decision to deny benefits because (1) the Defendant Plan failed to adhere to the regulatory deadlines

22   for acting on his claim, (2) the decisions denying him benefits are devoid of any real reasoning, (3)

23   the BPC did nothing more than rubber stamp the third-party administrator's decision in denying his

24   claim, (4) the Defendant Plan failed to take any safeguards to ensure that the conflict of interest

25   would not affect its benefits decision, and (5) the Defendant Plan offered multiple interpretations in

26   support of its benefits decision. *See* Mot. at 24.

27        As a preliminary matter, the Court takes note that it is not clear whether the problems

28   identified by Mr. Barnes above with respect to his own claim should necessarily affect the standard

United States District Court

For the Northern District of California

of review for the class claim.  But, even assuming such, many of the problems identified by Mr.

Barnes are not in fact problems – even when the Court views all evidence in the light most favorable

to Mr. Barnes.  For example:

- As discussed above, the Defendant's failure to adhere to the regulatory deadlines was at best a minor violation.

- Contrary to what Mr. Barnes argues, the decisions rendered by the Defendant Plan were not devoid of reasoning but rather rested on the specific reasoning that Mr. Barnes was not entitled to a redetermined ATB because he had already cashed out his ATB at the time of his first termination.  *See* Docket No. 298 (Holland Decl., Ex. A.10) (ATTP 3580) (initial denial) (quoting Benefits Binder provision stating that, "'[i]f you took a cashout of the [ATB], it will be disregarded for future pension benefits'"); Docket No. 298 (Holland Decl., Ex. A.10) (ATTP 3471) (denial of appeal) (quoting the same).

- The fact that the BPC accepted the reasoning of the lower decisionmaker with respect to Mr. Barnes's claim does not establish that there was rubber stamping.  There was no need for the BPC to do an investigation of its own because there were no real facts to investigate; the question before the BPC was largely one of plan interpretation.

The only problems identified by Mr. Barnes that have more merit are (4) and (5) above – *i.e.*, the Defendant Plan's failure to take safeguards and the Defendant Plan's multiple interpretations of the Plan.

As to the first point, the Ninth Circuit has indicated that a conflict of interest will have less importance "'where the administrator has taken active steps to reduce potential bias and to promote accuracy, for example, by walling off claims administrators from those interested in firm finances, or by imposing management checks that penalize inaccurate decisionmaking irrespective of whom the inaccuracy benefits.'"  *Burke*, 544 F.3d at 1025.  Here, the evidence of record indicates that the Defendant Plan took limited steps to reduce potential bias and to promote accuracy, at least when it denied Mr. Barnes's claim as part of the administrative process.  For example, the fact that the Defendant Plan "invited [Mr. Barnes] to participate in the [administrative] review," Sur-Reply at 8, is not that significant.  As for the Defendant Plan's claim that "BPC generally has its decisions

United States District Court

For the Northern District of California

1   reviewed by in-house counsel for ERISA compliance," Sur-Reply at 8 (citing in support Holland

2   deposition), that does promote accuracy; however, there is no indication that there was an in-house

3   review in Mr. Barnes's case.

4          That being said, in 2011, when the BPC prepared the third and final interpretation discussed

5   above, significant steps to reduce potential bias and promote accuracy were taken.  Most notably, the

6   BPC retained independent counsel (separate from the Defendant Plan's litigation counsel) to advise

7   on the interpretation of the Plan, and, ultimately, the BPC relied on independent counsel's

8   recommendations.  *See* Docket No. 292 (Swanson Decl., Ex. A) (BPC 2011 interpretation); Docket

9   No. 292 (Swanson Decl., Ex. I) (independent counsel memo).  Taking into account the process

10  which resulted in the third interpretation, the Court cannot say – as Mr. Barnes argues – that it is a

11  justifiable inference that the conflict of interest likely affected the decision to deny benefits.  This

12  conclusion is reinforced by the fact that Mr. Barnes has failed to point to a "'history of biased claims

13  administration.'"  *Burke*, 544 F.3d at 1025; *see also Abatie*, 458 F.3d at 968 (noting that a conflict of

14  interest will have less importance if, *e.g.*, there is no evidence of malice, self-dealing, or a

15  parsimonious claims-granting history).

16         This leaves, as Mr. Barnes's best argument, the contention that abuse of discretion must be

17  tempered with skepticism because of the Defendant Plan's multiple interpretations of the Plan.  With

18  respect to this argument, the Court bears in mind that, as noted above, the Defendant Plan has

19  always taken the same basic interpretation of § 3.4(a).  There have been multiple interpretations with

20  respect to § 3.4(d)(3) only.

21         As for those multiple interpretations of § 3.4(d)(3), the Defendant Plan argues that it cannot

22  be charged with any of those interpretations except for the third and final interpretation which is the

23  one specifically provided by the BPC.  The Defendant Plan emphasizes that only the BPC has the

24  authority, under the Plan, to interpret the Plan; thus, the Defendant Plan suggests, the Court should

25  give little to no weight to the first interpretation (provided by litigation counsel and supported by a

26  declaration from Ms. Francis) or to the second interpretation (provided by Ms. Francis, testifying as

27  the 30(b)(6) deponent).

28         As a formal matter, the Defendant Plan is correct that only the BPC has the authority to

20

United States District Court

For the Northern District of California

1   interpret the Plan.  Furthermore, there is nothing to indicate that the first and second interpretations

2   were ever run by the BPC or were otherwise considered by the BPC.  Nevertheless, it still seems

3   artificial – not to mention unfair – to say that the first and second interpretations are therefore

4   meaningless.  Litigation counsel easily could have run the first interpretation by the BPC; similarly,

5   Ms. Francis could have testified in her deposition that she needed to confer with the BPC to

6   determine how it interpreted § 3.4(d)(3).  Moreover, it is notable that Ms. Francis never corrected

7   her deposition testimony.

8          For purposes of this opinion, and in the context of this litigation, the Court assumes that it is

9   appropriate to charge the Defendant Plan with all three interpretations (and not just the last).  The

10  question for the Court, therefore, is whether these multiple interpretations should lead to a

11  heightened standard of review.

12         As a legal matter, the Court agrees with Mr. Barnes that multiple interpretations may lead to

13  a heightened abuse-of-discretion review.  *See, e.g.*, *Butts v. Continental Cas. Co.*, 357 F.3d 835, 838

14  (8th Cir. 2004) (stating that, "[t]o apply the abuse of discretion standard, we look to whether the plan

15  fiduciaries acted consistently with the ERISA-qualified plan's goals, and whether the plan's

16  interpretation was internally inconsistent or contrary to the plan's clear language"); *Alford v. DCH*

17  *Found. Group Long-Term Life Ins. Co. of Am.*, 144 F. Supp. 2d 1183, 1208-09 (C.D. Cal. 2001)

18  (stating that plaintiff failed to produce any evidence that "self-interest, or conflict of interest, on

19  UNUM's part affected its decision-making or otherwise led to a breach of fiduciary obligations" –

20  *e.g.*, "[t]here is no allegation or evidence that UNUM has offered inconsistent bases for denial,

21  changed its interpretation of plan documents, failed to follow internal procedures for making claims

22  or appealing denials, or otherwise allowed a conflict of interest to taint its decision(s)"); *see also*

23  *Conkright*, 130 S. Ct. at 1648 (noting that "the lower courts made no finding that the Plan

24  Administrator had acted in bad faith or would not fairly exercise his discretion to interpret the terms

25  of the Plan").  Multiple interpretations may be construed as the plan administrator acting in bad faith

26  depending on the circumstances.

27         The problem in the instant case is that, even when the multiple interpretations are taken into

28  account, as noted above and discussed below, it is not a justifiable inference that the Defendant Plan

United States District Court

For the Northern District of California

1   was acting in bad faith.

2         As a preliminary matter, the Court notes that the first and third interpretations of § 3.4(d)(3)

3   are essentially the same – *i.e.*, § 3.4(d)(3) covers both deferred and immediate annuitants.  It is only

4   the second interpretation – *i.e.*, that § 3.4(d)(3) covers immediate but not deferred annuitants –

5   which is contradictory.  Notably, both the first and second interpretations were, in essence, given by

6   Ms. Francis (in a declaration and in a deposition, respectively).  However, nowhere in the record is

7   there an explanation as to why Ms. Francis completely changed her testimony.  Judge Patel never

8   explored this issue when she considered Mr. Barnes's motion to amend the class certification order.

9   If Ms. Francis had simply made an honest mistake, then, as the Supreme Court indicated in

10  *Conkright*, there would be no reason to apply any heightened review.  *See id.* at 1644 (concluding

11  that a single honest mistake in plan interpretation does not justify stripping the plan administrator of

12  deference for subsequent related interpretations of the plan).  While the Court does charge the

13  Defendant Plan with the interpretations offered by Ms. Francis, that does not preclude the possibility

14  that she made an honest mistake in offering the second interpretation.

15        In his papers, Mr. Barnes basically makes three arguments as to why the changing

16  interpretation of § 3.4(d)(3) is suggestive of bad faith.  First, Mr. Barnes suggests that the Defendant

17  Plan adopted the second interpretation – *i.e.*, that deferred annuitants are not covered by § 3.4(d)(3)

18  – in order to avoid paying deferred annuitants both the (x) and (y) values.  The problem with this

19  argument is that it fails to explain why the Defendant Plan adopted the first interpretation.  In other

20  words, the Defendant Plan could have taken the position from the outset that § 3.4(d)(3) does not

21  cover deferred annuitants, but it did not.  Rather, the Defendant Plan adopted as its first

22  interpretation the position that deferred annuitants are covered.  Moreover, the Court notes that the

23  number of deferred annuitants who are in the class appears to be small – *i.e.*, only three – a fact that

24  Mr. Barnes does not dispute.  *See* Opp'n at 8 (noting that the class consists of only seven lump sum

25  payees and three deferred annuitants).  With only three deferred annuitants, it is highly unlikely that

26  there is such a large sum of money at issue that the Defendant Plan was motivated to take an

27  interpretation that would exclude deferred annuitants.

28        Second, Mr. Barnes argues that the Defendant Plan was motivated to adopt the third

interpretation because of what was taking place in another case (*Dwyer*), one which involved a much larger potential class. *See* Mot. at 21; Reply at 16. The problem here is that Mr. Barnes has failed to explain why it is bad faith for the Defendant Plan to want to take on consistent interpretations in the two lawsuits. If anything, consistent interpretation seems suggestive of good faith. *See* Sur-Reply at 8 (noting that similarly situated participants must be treated consistently under ERISA).

Third, Mr. Barnes contends that the Defendant Plan was motivated to adopt the third interpretation because of how Judge Patel read the plain language of § 3.4(d)(3), as reflected in her order granting the motion to modify the class certification order. The timing, however, is off. Judge Patel issued her order on March 1, 2011. *See* Docket No. 240 (order). If the Defendant Plan were truly responding to Judge Patel's order, then one would expect that the third interpretation would issue shortly thereafter. In fact, the third interpretation did not come out until August 31, 2011. *See* Docket No. 292 (Swanson Decl., Ex. A) (2011 BPC interpretation); *see also* Docket No. 292 (Swanson Decl., Ex. I) (independent counsel memo to BPC, dated July 15, 2011). More important, even if the timing were better, it is far from clear that the third interpretation was rendered as a response to Judge Patel's order. Admittedly, Judge Patel indicated in her order that deferred annuitants could be covered by § 3.4(d)(3), and the third interpretation now concedes that deferred annuitants are in fact covered. However, Judge Patel's reading of § 3.4(d)(3) was equally applicable to lump sum payees, *see* Docket No. 240 (noting that "section 3.4(d)(3) applies to any employee who 'was eligible to receive' an immediate annuity" and that "employees who elected to receive a lump-sum cashout or a deferred annuity were, upon first retirement, eligible to receive an immediate annuity, notwithstanding their subsequent choice to accept their pension benefit as a lump-sum cashout or as a deferred annuity"), and the Defendant Plan has never departed from its position that § 3.4(d)(3) does not cover such employees. Finally, as previously noted, even if the Defendant Plan did respond in part to Judge Patel's order, the claim of bad faith is hard to sustain because (1) the Defendant Plan has consistently taken the same interpretation with respect to § 3.4(a) and (2) the Defendant Plan is paying out benefits under the "new" interpretation of § 3.4(d)(3) rather than denying them – to the benefit of deferred annuitants.

Given the above, the Court finds, as a matter of law, that an inference of bad faith is not

United States District Court

For the Northern District of California

justifiable, even when the evidence is viewed in the light most favorable to Mr. Barnes. Accordingly, at best, Mr. Barnes has established that the multiple interpretations of § 3.4(d)(3) should give rise to abuse-of-discretion review tempered with slight skepticism.[9]

> 5.     Interpretation of §§ 3.4(a) and 3.4(d)(3)

Mr. Barnes argues that, even under an abuse-of-discretion standard, he is still entitled to summary judgment on Count II.  More specifically, Mr. Barnes argues that, whether the review is de novo or for an abuse of discretion, the plain and unambiguous language of the Plan makes his interpretation the only reasonable interpretation.  *Cf. Caldwell v. PNC Fin. Servs. Group, Inc.*, No. 2:11-cv-182, 2011 U.S. Dist. LEXIS 145721, at *31 (S.D. Ohio Dec. 19, 2011) (concluding that, regardless of the standard of review, "the Appeal Committee's interpretation of the Plan was the only reasonable interpretation as a matter of law"); *Hall v. Kodak Occupational Accidental Death Ins. Plan*, No. 08-CV-6402 CJS, 2011 U.S. Dist. LEXIS 65202, at *17 (W.D.N.Y. June 8, 2011) (stating that, "[u]nder the plain and unambiguous language of [the plan], the Court finds as a matter

---

[9]  The Court rejects Mr. Barnes's suggestion that *Nolan v. Heald College*, 551 F.3d 1148 (9th Cir. 2009), requires a trial on the issue of bias.  In *Nolan*, the Ninth Circuit noted:

> In this case, the evidence of bias that [plaintiff] submitted, and which was outside of the administrative record, bore directly on the contours of the abuse of discretion standard, *as it permitted an inference* that Network Medical Review and Drs. Silver and Jares were biased in favor of MetLife.  The district court apparently rejected that inference, but did so on summary judgment without applying any of the traditional rules of summary judgment (e.g., the requirement that evidence be viewed in the light most favorable to the non-moving party).  Nor did the district court conduct a bench trial on the issue of bias, which in and of itself would have ensured a full bias inquiry.  Instead, without evidentiary hearing or bench trial, the district court considered and rejected [plaintiff's] bias argument by weighing the documentary evidence of bias, and ignoring the protections that summary judgment usually affords the non-moving party.  Though the district court would have been permitted to weigh such evidence after bench trial, weighing that evidence on summary judgment was improper in this case where the evidence was outside of the administrative record.

*Id.* at 1154 (emphasis added).  Here, the Court concludes that the evidence submitted does not permit an inference of bad faith on the part of the Defendant Plan.  Alternatively, even viewing the evidence to draw reasonable inferences in Mr. Barnes's favor, any negative inference would not be enough to justify abuse-of-discretion review tempered by strong skepticism.

of law that [plaintiff's] death from mesothelioma is not covered, regardless of whether the Court

were to apply the de novo standard of review or the arbitrary and capricious standard of review").

On the other hand, if the language of the Plan is ambiguous – *i.e.*, it is susceptible to more

than one reasonable interpretation – then, under an abuse-of-discretion standard, the Defendant

Plan's decision to deny benefits must be upheld so long as

> it is based upon a reasonable interpretation of the plan's terms and if it
> was made in good faith.  The question [a court] must ask is not "whose
> interpretation of the plan is most persuasive, but whether the . . .
> interpretation is unreasonable."  A consistent pattern of interpretation
> is "significant evidence" that the plan administrator acted reasonably
> in interpreting ambiguous plan language.

*McDaniel v. Chevron Corp.*, 203 F.3d 1099, 1113 (9th Cir. 2000).[10]

As noted above, Mr. Barnes contends that the Plan terms are so plain and unambiguous that

it does not matter that the review is for abuse of discretion – his interpretation is the only reasonable

interpretation.

Whether the terms of a plan are plain or unambiguous is a question of law.  *See McDaniel*,

203 F.3d at 1110.  "[T]erms in a pension plan should be interpreted 'in any ordinary and popular

sense as would a [person] of average intelligence and experience." *Id.*  "An ambiguity exists when

the terms or words of a . . . plan are subject to more than one reasonable interpretation.  In fact, only

by excluding all alternative readings as unreasonable may [a court] find that a plan's language is

plain and unambiguous." *Id.*

---

[10] To the extent Mr. Barnes argues that, as a canon of construction, any ambiguity should be construed in his favor (as the Plan participant), *see* Reply at 19 (citing *Patterson v. Hughes Aircraft Co.*, 11 F.3d 948, 950 (9th Cir. 1993)), he is not correct.  "In *Winters v. Costco Wholesale Corp.*, 49 F.3d 550 (9th Cir. 1995), the Ninth Circuit held that 'the rule of contra proferentem is not applicable to self-funded ERISA plans that bestow explicit discretionary authority upon an administrator to determine eligibility for benefits or to construe the terms of the plan.'" *Martinez v. Pacific Gas & Elec. Co. Long Term Disability Plan*, No. 1:05-CV-00931 OWW DLB, 2006 U.S. Dist. LEXIS 84026, at *29-30 (E.D. Cal. Nov. 17, 2006); *see also Blankenship v. Liberty Life Assur. Co.*, 486 F.3d 620, 625 (9th Cir. 2007) (noting that "[c]ontra proferentem . . . holds that 'if, after applying the normal principles of contractual construction, the insurance contract is fairly susceptible of two different interpretations, another rule of construction will be applied: the interpretation that is most favorable to the insured will be adopted'"; adding that "[t]he rule applies in interpreting ambiguous terms in an ERISA-covered plan except where the plan: (1) grants the administrator discretion to construe its terms, (2) is the result of a collective-bargaining agreement, or (3) is self-funded").

1    In the instant case, Mr. Barnes argues that the plain language of § 3.4(d)(3) establishes that it

2    is applicable to both lump sum payees and deferred annuitants alike.  Mr. Barnes emphasizes that

3    Judge Patel, in her order modifying the class definition to include deferred annuitants, indicated that

4    the plain language supported such:

5           The first sentence of section 3.4(d)(3) states:

6           If the Employee was receiving, *or was eligible to*
            *receive*, a monthly pension under the accelerated
7           transition benefit formula at his or her prior
            Termination of Employment, the Employee's Plan
8           benefit at the Annuity Start Date(s) following his or her
            next Termination of Employment will be equal to (x)
9           *plus* (y) . . . (Emphasis added).

10          On its face, section 3.4(d)(3) applies to any employee who "was
            eligible to receive" an immediate annuity. Defendant does not dispute
11          that employees who elected to receive a lump-sum cashout or a
            deferred annuity were, upon first retirement, eligible to receive an
12          immediate annuity, notwithstanding their subsequent choice to accept
            their pension benefit as a lump-sum cashout or as a deferred annuity.
13          Moreover, the plain language of section 3.4(d)(3) does not specify that
            section 3.4(d)(3) does not apply to employees who were eligible to
14          receive an immediate annuity but ultimately elected to receive a lump-
            sum cashout or a deferred annuity.  Notwithstanding the plain
15          language, however, defendant interprets section 3.4(d)(3)'s
            prescription of "x" plus "y" as applicable only to immediate annuitants
16          and as inapplicable to lump-sum recipients and deferred annuitants.
            The court concludes that the plain language of section 3.4(d)(3)
17          suggests otherwise and a disposition in favor of plaintiff would
            consequently apply with equal force to both lump-sum recipients, such
18          as Barnes, as well as deferred annuitants.

19   Docket No. 240 (Order at 8).

20          To the extent Judge Patel found the language in § 3.4(d)(3) unambiguous, the Court

21   respectfully disagrees.  More specifically, the Court finds the phrase "eligible to receive[] a monthly

22   pension" ambiguous.  Judge Patel's interpretation of the phrase is one reasonable interpretation.

23   However, the phrase can also fairly be understood to mean that a lump sum payee would not be

24   "eligible to receive[] a monthly pension" because he or she had elected at the time of his or her first

25   termination of employment to take a lump sum payment rather than an annuity.[11]

---

26          [11] To the extent Mr. Barnes argues that eligibility must be determined at the exact date of
     first termination to the exclusion of the employee's ensuing election to take the lump sum benefit,
27   the Court does not agree.  It is not unreasonable to construe the phrase "eligible to receive . . . at his
     or her prior Termination of Employment" as eligible to receive at about the time of or in connection
28   with an employee's first termination, especially if it is not uncommon for elections to be made after

United States District Court
For the Northern District of California

Mr. Barnes argues that the latter interpretation imposes a standard of eligibility not required by the Plan. But the case on which Mr. Barnes primarily relies, *Canseco v. Construction Laborers Pension Trust*, 93 F.3d 600 (9th Cir. 1996), is distinguishable. In *Canseco*, the trustees of the plan at issue denied the plaintiffs' claim for retirement benefits because they failed to apply for the benefits. The Ninth Circuit agreed with the plaintiffs that an application was not a prerequisite for the receipt of benefits:

> We start with Article II, which governs "Eligibility for Retirement Benefits." Section 2.02 of Article 2 provides that an employee "shall be entitled to retire on a Regular Pension under this Plan if he satisfies all of the requirements of one of the following plans[.]" It then enumerates three requirements for eligibility under Plan Two: (1) 15 years of service, (2) attainment of age 62, and (3) 700 "covered hours" of employment. By its mandatory language ("shall be entitled"), Section 2.02 provides that these three criteria – years of service, age, and covered hours – are the sole and exclusive requirements for eligibility under the CLPT plan. Section 2.02 thus does not require an application for benefits as a condition of eligibility. Instead, Section 2.02 confers eligibility on an employee once he has satisfied the three conditions listed in Plan Two. In plain and absolute terms, Section 2.02 provides that an employee who satisfies all three requirements "*shall be entitled* to retire on a Regular Pension."

*Id.* at 606 (emphasis in original). In short, in *Canseco*, the Ninth Circuit found that the trustees' interpretation of the plan "'clearly conflict[ed] with the plain language of the plan.'" *Id.* In the instant case, Mr. Barnes fails to explain how the Defendant Plan's interpretation of "eligible to receive[] a monthly pension" is contradictory to the express language of the plan. Furthermore, there is no language in the Plan comparably contradicted as in *Canseco*.[12]

That the Defendant Plan's interpretation is in fact a fair one is further supported by other provisions of § 3.4. For example, as the Defendant Plan points out, § 3.4(d)(1) and (2) – like §

---

the actual date of termination.

[12] In addition to *Canseco*, Mr. Barnes has cited *Jones v. Metropolitan Life Insurance Co.*, 385 F.3d 654 (6th Cir. 2004), and *Swaback v. American Information Technologies Corp.*, 103 F.3d 535 (7th Cir. 1996). These cases are also distinguishable. In *Jones*, the Sixth Circuit "conclude[d] that MetLife acted arbitrarily and capriciously when it interpreted the [undefined] term [in the insurance policy] 'accident' in a manner that adds requirements not found in the Plan documents [*e.g.*, that an insured be engaged in 'unusual activity' or meet with an 'external force or event' in order for her injury to be considered an accident] or supported by federal common law." *Jones*, 385 F.3d at 661. In *Swaback*, the Seventh Circuit concluded that the "clear and unambiguous" language of the pension plan established that there were "only five conditions on the election of [a] lump sum option" – none of which was that "an employee must be on the active payroll or be medically fit in order to elect a lump sum distribution." *Swaback*, 103 F.3d at 541.

3.4(d)(3) – use the phrases "eligible to receive" and "receiving."  Section 3.4(d)(1) clearly applies to deferred annuitants and (2) to immediate annuitants.

> (1)    If the Employee was *eligible to receive* a cash balance benefit at his or her prior Termination of Employment, but the Annuity Start Date for such benefit had not occurred at the rehire date, the Employee's Plan benefit at his or her Annuity Start Date will be the cash balance benefit under Section 4.5(b) . . . .
>
> (2)    If the Employee is *receiving* a monthly pension based on his or her cash balance benefit determined at the Annuity Start Date preceding rehire, the right to payment will be suspended, and the present value of the annuity, determined as of the rehire date, will be credited as an opening balance to the Employee's Account.  The Employee's Plan benefit at the Annuity Start Date following his or her next Termination of Employment will be the cash balance benefit under Section 4.5(b) . . . .

Docket No. 110 (1998 PTG Plan § 3.4(d)) (emphasis added).

Mr. Barnes argues that § 3.4(d)(1) clearly applies to deferred annuitants but only because it includes the clause "but the Annuity Start Date for such benefit had not occurred at the rehire date." According to Mr. Barnes, the failure of § 3.4(d)(3) to include this clause indicates that § 3.4(d)(3) was meant to cover a broader class of employees, *i.e.*, not only deferred annuitants but also lump sum payees.  While this is not an unfair point, it does not establish that Mr. Barnes's interpretation is the only reasonable interpretation.  Taking into account the language and structure of § 3.4(d)(1)-(3), one could reasonably conclude that (3) was meant to cover the persons subject to (1) and (2) – *i.e.*, deferred and immediate annuitants.

Furthermore, there is ambiguity in § 3.4(d)(3) by virtue of § 3.4(a) alone.  While § 3.4(d)(3) applies to certain situations where there is a "Prior Benefit," § 3.4(a) applies where there is "No Prior Benefit."  In the 1996 Plan, § 3.4(a) provided:

> 3.4(a) No Prior Benefit.  If the Employee has no prior accrued benefit that is or becomes a Plan liability *(e.g., the prior benefit was paid, or deemed to be paid, as a cashout payment)*, the Employee's Plan benefit at his or her next Termination of Employment will be the cash balance benefit accrued from the rehire date under Section 4.5(b).

Docket No. 107 (1996 PTG Plan § 3.4(a)) (emphasis added).  Based on the italicized language above, § 3.4(a) can reasonably be construed as providing that an employee who cashes out his ATB

United States District Court

For the Northern District of California

as a lump sum payment is, upon rehire, entitled to only a cash balance benefit – and therefore not any further ATB.

Admittedly, § 3.4(a) was amended as part of the 1998 Plan, but that amendment still does not make Mr. Barnes's position the only reasonable one. In the 1998 Plan, § 3.4(a) read as follows:

> 3.4(a) <u>No Prior Benefit</u>. If the Employee has no prior accrued benefit that is a Plan liability (e.g., the prior benefit was paid, or deemed to be paid, as a cashout payment) or becomes a Plan liability *(e.g., a Plan benefit that becomes vested after service is bridged under Section 7.4)*, the Employee's Plan benefit at his or her next Termination of Employment will be the cash balance benefit accrued from the rehire date determined under Section 4.5(b).

Docket No. 110 (1998 PTG Plan § 3.4(a)) (emphasis added). Mr. Barnes argues that, once he bridged his service upon rehire, then he had a prior accrued benefit that became a Plan liability such that § 3.4(a) could not apply to him (or other similarly situated lump sum payees). This is not an unfair point. However, it is also reasonable to conclude otherwise. First, given the language used in the 1996 Plan – *i.e.*, "[i]f the Employee has no prior accrued benefit that is or *becomes a Plan liability (e.g., the prior benefit was paid, or deemed to be paid, as a cashout payment)*" (emphasis added) – it was reasonable for the Defendant Plan to continue to view a cashout as a circumstance that would preclude a benefit from becoming a Plan liability. As for the new language under the 1998 Plan, it can reasonably be interpreted as providing a way for a benefit to become a "Plan liability" only when the benefit becomes "vested" after bridging. That is not the case with Mr. Barnes.

Mr. Barnes protests still that the above interpretation of § 3.4(a) is unreasonable because it would render § 3.13 nugatory. Section 3.13, titled "Effect of Prior Cashout on Plan Benefit," provides as follows:

> If an Employee's Term of Employment for purposes of benefit accrual determined as of June 30, 1996 includes service for which the Participant received a cashout payment under the Plan, or under the Pacific Telesis Group Pension Plan or an Interchange Company Pension Plan, the Participant's Plan benefit at the next Termination of Employment, to the extent based on a Participant's Term of Employment, will be reduced by offsetting the then current benefit payable as an immediate annuity by the immediate annuity that was previously cashed out.

1  Docket No. 110 (1998 PTG Plan § 3.13).  But as the Defendant Plan points out, plausibly, § 3.13

2  applies only to employees who, as of June 30, 1996 (the date the 1996 PTG Plan became effective),

3  had already received a lump sum payment.  *See* Sur-Reply at 14.  Defendant also points out that §

4  3.13 could reasonably be interpreted as a provision that was supposed to work in tandem with §

5  3.4(a) – "to avoid[] the double counting of service, including service under the Group Pension Plan

6  and an Interchange Plan, which are not covered by Section 3.4(a)."  Opp'n at 28 n.31.

7      Accordingly, the Court concludes that there is ambiguity in the Plan.  Furthermore, because

8  the Court has concluded that abuse-of-discretion review tempered only by slight skepticism is

9  appropriate, and the Defendant Plan's interpretation is reasonable and not made in bad faith, the

10  Court defers to the Defendant Plan's interpretation and upholds its decision to deny benefits.  In so

11  holding, the Court notes that the Defendant Plan's consistent interpretation of § 3.4(a) – as borne out

12  by the Benefits Binder – is significant evidence that it acted reasonably in interpreting ambiguous

13  Plan language.  *See McDaniels*, 203 F.3d at 1113.

14      In the attempt to avoid this outcome, Mr. Barnes argues that the Defendant Plan's

15  interpretation above is, in essence, the 2011 BPC interpretation, which should be given no deference

16  at all, even under an abuse-of-discretion standard.  But so long as there is no bad faith on the part of

17  the Defendant Plan in making the interpretation, deference is still owed to its interpretation.  The

18  2011 interpretation is consistent with the same earlier interpretations of § 3.4(a) – it applies to lump

19  sum payees and hence by default § 3.4(d)(3) cannot apply.  Finally, to the extent Mr. Barnes points

20  out that the 2011 interpretation is not part of the administrative record, that is true.  However, as

21  noted above, the Defendant Plan cannot be blamed for not interpreting § 3.4(d)(3) during the

22  administrative proceedings because it was not identified by Mr. Barnes until several years into this

23  litigation.  In short, the fact that the 2011 BPC interpretation is not part of the administrative record

24  does not preclude deference to its position in this litigation.

25      For the foregoing reasons, the Court concludes the Defendant Plan is entitled to summary

26  judgment on Count II.

27  ///

28  ///

30

D.      Count V – Special ATB

As noted above, Count V is an individual and a class claim (as of date, uncertified).  *See* Docket No. 240 (Order at 14 n.6).  In this claim, Mr. Barnes alleges that, under the SBC Plan, "a participant employed . . . on January 1, 1999, who has accrued a right to an [ATB] under the PTG Pension Plan was entitled to receive an alternative CB [cash balance] benefit called the Special ATB."[13]  Docket No. 243 (SAC ¶ 180); *see also* Docket No. 299-3 (ATTP 2943) (SBC Plan, Supplement 1, § S1.7) (providing for the Special ATB).  Count V basically rises or falls with Count II – *i.e.*, it depends on Mr. Barnes having a right to an ATB (as opposed to only a cash balance benefit) in the first place.  Because the Court finds in the Defendant Plan's favor on Count II, the Defendant Plan is also entitled to summary judgment on Count V.

### III.   CONCLUSION

For the reasons discussed above, the Court hereby rules as follows:

(1)     Mr. Barnes is entitled to summary judgment on Count I.  However, he is not entitled to any substantive relief for the violation of ERISA's notice requirements because a remand would essentially be a useless formality.

(2)     The Defendant Plan is entitled to summary judgment on Counts II and V.

As noted above, the counts not at issue with the pending motions for partial summary judgment are Counts III and IV (*i.e.*, violation of ERISA's anti-cutback, anti-forfeiture, and actuarial equivalence requirements).  The Court hereby sets a case management conference on May 25, 2012, at 10:30 a.m., to discuss with the parties how to proceed with these claims.

IT IS SO ORDERED.


Dated:  May 10, 2012

_____
EDWARD M. CHEN
United States District Judge

---

[13]  The counts not at issue with the pending motions for partial summary judgment are Counts III and IV.  Basically, in these counts, Mr. Barnes contends that, if the Defendant Plan's interpretation of §§ 3.4(a) and 3.4(d)(3) is correct, then the Defendant Plan violates ERISA's anti-cutback, anti-forfeiture, and actuarial equivalence requirements.