**United States District Court**
For the Northern District of California

1
2
3
4
5          UNITED STATES DISTRICT COURT

6          NORTHERN DISTRICT OF CALIFORNIA

7

8    QUILLER BARNES,                                    No. C-08-4058 EMC

9                    Plaintiff,

10          v.                                          **ORDER GRANTING PLAINTIFF'S
                                                        MOTION FOR ATTORNEY'S FEES**
11   AT&T PENSION BENEFIT PLAN -
     NONBARGAINED PROGRAM,                              **(Docket No. 355)**
12
                     Defendant.
13   _____/

14

15

16          Plaintiff Quiller Barnes initiated this action on behalf of himself and a class, asserting that

17   Defendant AT&T Pension Benefit Plan – Nonbargained Program owed them additional benefits.

18   Mr. Barnes asserted five claims for relief.  On May 10, 2012, the Court addressed the parties' cross-

19   motions for summary judgment on three of the claims.  The Court granted Mr. Barnes summary

20   judgment on Count I of the complaint but granted the Defendant Plan summary judgment on Counts

21   II and V.  Subsequently, the parties stipulated to dismissal of Counts III and IV.  *See* Docket No. 309

22   (Order at 31).  Mr. Barnes has appealed, *inter alia*, this Court's summary judgment order to the

23   Ninth Circuit.  *See* Docket No. 371 (notice of appeal).  In the meantime, currently pending before

24   the Court is Mr. Barnes's motion for attorney's fees and nontaxable costs.  Mr. Barnes is asking for

25   more than $1.3 million in fees and $75,000 in costs.  *See* Mot. at 2; *see also* Roberts Reply Decl. ¶ 3.

26          Having considered the parties' briefs and accompanying submissions, as well as the oral

27   argument of counsel and all other evidence of record, the Court hereby **GRANTS** Mr. Barnes's

28

United States District Court

For the Northern District of California

1   motion but orders the parties to provide supplemental briefing so that the Court may determine what

2   the exact amount of fees and costs awarded should be.

3                              **I.    FACTUAL & PROCEDURAL BACKGROUND**

4           Because the parties stipulated to dismissal of Counts III and IV, and because the viability of

5   Count V is dependent on the viability of Count II, the critical claims in the instant case are Counts I

6   and II.  As noted above, the Court granted summary judgment to Mr. Barnes on Count I but granted

7   the Defendant Plan summary judgment on Count II.

8   A.      Count I – Failure to Provide Adequate Notice

9           In Count I (an individual claim only), Mr. Barnes argued that the Defendant Plan had

10  violated ERISA by failing to give him adequate notice of the specific reasons for the denial of his

11  claim.  The Court held that there was a violation of ERISA's notice requirements because, even

12  though the Defendant Plan had given reasons for the denial, it did not cite the specific plan provision

13  on which it had relied (§ 3.4(a)), nor had it quoted the language of the provision or given a close

14  paraphrase; this affected the ability of Mr. Barnes to adequately appeal.  *See* Docket No. 309 (Order

15  at 8-9).

16          Ultimately, however, the Court declined to order any remedy because the normal remedy

17  would be to remand to the plan administrator and, here, a remand would be "essentially pointless

18  because it is now clear – if only through this litigation – that § 3.4(a) is the provision upon which the

19  Defendant Plan relied."  Docket No. 309 (Order at 9).  Based on the record, it appears that Mr.

20  Barnes had notice that the Defendant Plan was relying on § 3.4(a) at least as of February 5, 2010,

21  when the Defendant Plan filed a motion for summary judgment and highlighted that provision in

22  support of its position.  *See* Docket No. 47 (Def.'s Mot. for Summ. Judg. at 4, 14) (highlighting §

23  3.4(a) and arguing that "[t]he plain language of the plan provisions in Section 3.4(a) . . . expressly

24  prohibit a pension calculation for a rehired employee that ignores a prior cashout by the employee").

25  It is plausible, however, that Mr. Barnes knew of § 3.4(a) slightly earlier, as, on January 26, 2010, he

26  filed a motion for leave to amend his complaint, and the proposed amended complaint clearly relied

27  on § 3.4(d)(3) of the plan.  *See* Docket No. 39-1 (Prop. Am. Compl. ¶ 50).  If Mr. Barnes was

28  relying on § 3.4(d)(3), he likely knew of the other provisions in § 3.4, including § 3.4(a).

**United States District Court**
For the Northern District of California

B.        Count II – Failure to Pay Full Pension Benefits

In Count II (a certified class claim), Mr. Barnes argued that the Defendant Plan had failed to pay full pension benefits.  Initially, Mr. Barnes filed suit against the Defendant Plan as a lump-sum payee in his individual capacity only.  However, on January 26, 2010, he moved to amend his complaint, and one of the amendments he proposed was to include class allegations.  *See* Docket No. 39 (motion).  The proposed class consisted of persons who had not been paid a benefit known as a "redetermined ATB," implicitly pursuant to § 3.4(d)(3) of the plan.

Under § 3.4(d)(3) of the Plan,

> [i]f the Employee was receiving, or was eligible to receive, a monthly pension under the accelerated transition benefit [ATB] formula at his or her prior Termination of Employment, the Employee's Plan benefit at the Annuity Start Date(s) following his or her next Termination of Employment will be equal to (x) plus (y) where:
>
> (x) is the monthly benefit payable at the Employee's prior Termination of Employment under Section 5.1, except that if the prior benefit was subject to an age discount under Section 5.2, and the Employee's service is bridged under Section 7.4(a), the benefit will be adjusted to reflect the Employee's age and Term of Employment under Section 7.7 at the Employee's next Termination of Employment; and
>
> (y) is the monthly cash balance benefit under Section 4.5(b) based on allocations to the Employee's Account from the Employee's rehire date to the Annuity Start Date that applies to the cash balance benefit.

Docket No. 39-1 (Prop. Am. Compl. ¶ 50).  The (x) value above represented the redetermined ATB. The (y) value above represented a separate benefit, known as the cash balance benefit.  As a lump-sum payee, Mr. Barnes had been paid a cash balance benefit, but he had not been paid a redetermined ATB.  Mr. Barnes asserted that he was also entitled to a redetermined ATB, and not just a cash-balance benefit, under § 3.4(d)(3).  As indicated above, however, the Defendant Plan's position was that § 3.4(a), and not § 3.4(d)(3), governed the rights of lump-sum payees such as Mr. Barnes.

In Mr. Barnes's proposed amended complaint, the class was defined as follows:

(1)        Participants of the PTG Pension Plan, who meet the following requirements:

United States District Court
For the Northern District of California

(a)     who terminated their employment with a company that participated in the PTG Pension Plan after March 22, 1996;

(b)     who were eligible for a ATB, which, because they had not attained the requisite age or years of credited service, was subject to an ATB Discount,

(c)     who were subsequently rehired by a company that participated in the PTG Pension Plan on or before October 31, 1997, and worked at least five additional years; and

(d)     who, either (i) at their next termination, did not have their ATB adjusted to reflect their age and term of employment at their next termination of employment or (ii) are still employed at a Participating Company.

(2) Beneficiaries of any of the persons described in Group 1.

Docket No. 39-1 (Prop. Am. Compl. ¶ 15).

While the proposed class definition did not explicitly include annuitants as members of the class (in addition to lump-sum payees such as Mr. Barnes), implicitly, annuitants were included because an annuitant, like a lump-sum payee, could be an employee "receiving, or . . . eligible to receive, a monthly pension under the accelerated transition benefit [ATB] formula at his or her prior Termination of Employment" as stated in § 3.4(d)(3).[1]  The proposed class, however, was expressly limited to persons who had not been given, in effect, a full ATB.  *See* Docket No. 39-1 (Prop. Am. Compl. ¶ 15) (alleging, in class definition, that class members did not, at their next termination, "have their ATB adjusted to reflect their age and term of employment at their next termination of employment").  The proposed class did not put at issue any benefits other than the ATB, such as a cash balance benefit.  Judge Patel granted the motion to amend.

Subsequently, Mr. Barnes moved for class certification.  Judge Patel granted that motion as well, although she limited the class definition to lump-sum payees only – *i.e.*, excluding annuitants. *See* Docket No. 176 (Order at 12-13).  A few months later, on December 20, 2010, Mr. Barnes

---

[1] As the Defendant Plan explained in its summary judgment papers, the plan gave employees a choice between three forms of benefit payment: an immediate lump sum, an immediate annuity, or a deferred annuity with payment commencing at age 65.  *See* Docket No. 295 (Cross-Mot. at 1).

United States District Court

For the Northern District of California

moved to modify the class definition so that annuitants (in particular, deferred annuitants) would be included in the class. *See* Docket No. 199 (motion). More specifically, Mr. Barnes asked Judge Patel to adopt the original class definition that he had proposed based on 30(b)(6) deposition testimony that had been given on behalf of the Defendant Plan. *See* Docket No. 199 (Mot. at 6). As noted above, Mr. Barnes's original class definition was targeted to individuals who had not been given a redetermined ATB.

The Defendant Plan opposed the motion to modify. With respect to deferred annuitants, the Defendant Plan argued that Mr. Barnes had misconstrued the testimony of the 30(b)(6) deponent, Hannah Francis:

> Plaintiff argues that, based on Ms. Francis's testimony, the Plan does not afford deferred annuitants with a "redetermined ATB" upon their second termination. The argument takes the term "redetermined ATB" out of context and ignores the sum and substance of Ms. Francis's testimony. If an employee does not elect to commence the distribution of his or her annuity and is rehired by a Participating Company, then upon the employee's second termination he or she is treated as if they never left the Company's employment at all, and the ATB is calculated taking into consideration the full, bridged term of service.

Docket No. 218 (Opp'n at 2). This was "directly contrary to the claim of Plaintiff herein, *i.e.* that he did *not* receive credit for his bridged service with respect to his ATB, while deferred annuitants do. As such, even if there could be some sort of claim with respect to deferred annuitants, Plaintiff Barnes is not similarly situated to them . . . ."[2] Docket No. 218 (Opp'n at 3) (emphasis in original).

On January 21, 2011, Mr. Barnes filed his reply brief in support of his motion to modify. In the reply, Mr. Barnes argued for the first time that just because a deferred annuitant could get a full ATB at second retirement missed the point. "The crux of Plaintiff's claim is that he was denied the *full benefit* under subsection 3.4(d)(3) . . . ." Docket No. 224 (Reply at 2) (emphasis added). "Mr. Barnes claims that he is entitled to benefits equaling (x) (a redetermined ATB) **plus** (y) (cash balance benefit). He was only given (y) because the Plan has interpreted subsection 3.4(d)(3) to apply to those participants who were receiving a monthly ATB pension at first retirement.

---

[2] The Defendant Plan also made an exhaustion argument with respect to the deferred annuitants.

1    Similarly, deferred annuitants are also denied (x) **plus** (y)" – more specifically, while they got a full

2    ATB (in effect (x)), they were not given in addition a cash balance benefit (*i.e.*, (y)).  Docket No.

3    224 (Reply at 3) (emphasis in original).  In short, deferred annuitants were getting (x), but not (y),

4    and thus they too were denied the *full benefits* under § 3.4(d)(3).  *See also* Docket No. 240 (Order at

5    7).

6          Ultimately, Judge Patel granted Mr. Barnes's motion to modify the class certification order.

7    But notably, in granting the order, Judge Patel acknowledged that there had been a "slight[] shift[]

8    [in] the focus of the litigation to the proper interpretation and application of section 3.4(d)(3) in its

9    entirety, *rather than its previous focus on the proper interpretation and application of the 'x' value*

10   *within section 3.4(d)(3), namely, the redetermination of the ATB benefit upon successful bridging*."

11   Docket No. 240 (Order at 7) (emphasis added).

12         Judge Patel ultimately modified class certification to reflect this change in focus – now

13   including a requirement that a class member "either (i) at their next termination, did not have their

14   benefit calculated to include *both an ATB adjusted to reflect their age and term of employment and a*

15   *cash balance benefit (or a Career Average Minimum benefit)* based on allocations to their account

16   since rehire as set forth in section 3.4(d)(3) of the PTG Pension Plan or (ii) are still employed at

17   Participating Company."  Docket No. 240 (Order at 11) (emphasis added).  Notably, if Judge Patel

18   had simply adopted the original class definition as proposed by Mr. Barnes, that would have limited

19   the class to those who did not get a redetermined ATB only; it would not have included those denied

20   the cash balance benefit.

21         After the instant case was reassigned from Judge Patel to this Court, this Court adjudicated

22   cross-motions for summary judgment.  The Court rejected Mr. Barnes's argument that de novo

23   review should apply to Count II and instead applied abuse-of-discretion review, tempered with slight

24   skepticism because of the Defendant Plan's multiple interpretations of § 3.4(d)(3).  *See* Docket No.

25   309 (assuming that it was appropriate to charge the Defendant Plan with three interpretations, only

26   one of which was formally issued by the Benefit Plan Committee ("BPC"), the entity charged with

27   interpreting the plan; the other two interpretations were offered during this litigation).  Under this

28   standard of review, the Court held that the language of the plan was ambiguous and that the

United States District Court

For the Northern District of California

1    Defendant Plan's interpretation of the plan was reasonable and in good faith.  *See* Docket No. 309

2    (Order at 30).  More specifically, the Court held that it was reasonable for the Defendant Plan to

3    interpret § 3.4(a) as being applicable to lump-sum payees (a position that the Defendant Plan had

4    always taken).  As for § 3.4(d)(3), in its final interpretation of this provision,[3] the Defendant Plan

5    conceded that it applied to *both* immediate and deferred annuitants alike, entitling them to full

6    benefits under § 3.4(d)(3).  Given this interpretation, any relief sought by Mr. Barnes on behalf of

7    deferred annuitants was rendered moot.  *See* Docket No. 340 (Order at 3-4).

8        Although the Defendant Plan's final interpretation of § 3.4(d)(3) was that it would apply to

9    both immediate and deferred annuitants, there actually were multiple interpretations of this

10   provision.  (In contrast, there were always only one interpretation of § 3.4(a) – *i.e.*, that it applied to

11   lump-sum payees.)  Moreover, those interpretations of § 3.4(d)(3) were not even made until *after*

12   this lawsuit had been initiated.

13       As noted by the Court in its summary judgment order, § 3.4(d)(3) was never interpreted by

14   the Defendant Plan – including the BPC, the entity formally charged with interpreting the plan – at

15   any time during the administrative proceedings.  This was because, during the administrative

16   proceedings, only lump-sum payees were expressly at issue (Mr. Barnes was a lump-sum payee)

17   and, since the Defendant Plan concluded that § 3.4(a) applied to lump-sum payees, there was no

18   need for it to even consider § 3.4(d)(3).  *See* Docket No. 309 (Order at 12).

19       The first time that § 3.4(d)(3) became an issue was during this litigation.  Mr. Barnes did not

20   raise § 3.4(d)(3) at the outset of the lawsuit in January 2008; rather, he first brought up § 3.4(d)(3)

21   on January 26, 2010 (*i.e.*, two years later), when he moved to file an amended complaint.  *See*

22   Docket No. 39 (motion); *see also* Docket No. 309 (Order at 13).

23       The first time that the Defendant Plan interpreted § 3.4(d)(3) was in March 2010, as part of a

24   reply in support of a motion for summary judgment.  Although the interpretation was not provided

25   by the BPC specifically, it was nonetheless offered on behalf of the Defendant Plan and was

26   supported by a declaration from Ms. Francis, the Director of Benefits for AT&T.  The interpretation

27

28   _____

   [3] This last interpretation was the only interpretation that was given by the BPC, the entity
   charged with interpreting the plan.

7

1   in March 2010 was that § 3.4(d)(3) applied to both immediate and deferred annuitants alike (but not

2   lump-sum payees). *See* Docket No. 86 (Hannah Decl.); *see also* Docket No. 309 (Order at 13).

3         In November 2010, however, when Ms. Francis was deposed as the Defendant Plan's

4   30(b)(6) witness, she offered a different interpretation of § 3.4(d)(3). She testified that § 3.4(d)(3)

5   applied only to immediate annuitants, but not deferred annuitants. Soon after the deposition, Mr.

6   Barnes moved to amend the class certification order (on Count II) because of the above testimony by

7   Ms. Francis. *See* Docket No. 199 (motion). As noted above, Judge Patel granted the motion on

8   March 1, 2011. *See* Docket No. 240 (order).

9         On June 24, 2011 (*i.e.*, approximately four months after Judge Patel's ruling), defense

10   counsel informed counsel for Mr. Barnes that the BPC intended to issue a formal interpretation of

11   the plan with respect to the treatment of lump-sum payees and deferred annuitants. *See* Docket No.

12   292-6 (letter). In the letter, defense counsel asserted that "[t]here can be no serious dispute that the

13   BPC did not have before it all the interpretive arguments Mr. Barnes now makes with respect to his

14   interpretation of various sections of the Plan at issue in this litigation" and "we disagree with your

15   client's assertion that the BPC had the opportunity to consider the issues of Plan interpretation in the

16   prior administrative process." Docket No. 292-6 (letter). Defense counsel also stated: "In order to

17   avoid the result that the Court may need to remand the plan interpretation questions to the BPC and

18   the delay associated with doing so at a later date, we believe it is appropriate to ask the BPC to

19   consider these issues with a full understanding of Plaintiff's claims, so that it can exercise the power

20   it has under the plan to render Plan interpretations." Docket No. 292-6 (letter). "Accordingly, the

21   BPC will consider the issues of Plan interpretation raised in this litigation at its July 18, 2011

22   meeting, including with respect to the treatment of both lump sum payees and deferred annuitants."

23   Docket No. 292-6 (letter).

24         On August 31, 2011, the BPC issued its formal interpretation in which it concluded, *inter*

25   *alia*, that § 3.4(d)(3) did indeed apply to both immediate and deferred annuitants alike (*i.e.*,

26   consistent with the first interpretation).

27

28

## II. DISCUSSION

In the pending motion for fees and costs, Mr. Barnes argues that he should be awarded his fees up until August 31, 2011 (*i.e.*, the date that the BPC issued its formal interpretation of § 3.4(d)(3)) because he achieved success on Count I and because his actions with respect to Count II served as a catalyst for the Defendant Plan to change its interpretation of § 3.4(d)(3) (from Ms. Francis's second interpretation to the BPC's formal interpretation), thus affording benefits to deferred annuitants.

### A.   Legal Standard

The relevant ERISA provision regarding fees and costs is 29 U.S.C. § 1132(g)(1).  It states as follows: "In any action under this title (other than an action described in paragraph 2) by a participant, beneficiary, or fiduciary, the court in its discretion may allow a reasonable attorney's fee and costs of action to either party."  29 U.S.C. § 1132(g)(1).

#### 1.   Some Degree of Success on the Merits

In *Hardt v. Reliance Standard Life Ins. Co.*, 130 S. Ct. 2149 (2010), the Supreme Court rejected the interpretation that, under § 1132(g)(1), fees and costs may be awarded only to a prevailing party.  *See id.* at 2156 (noting that the statute makes no reference to a prevailing party).  Rather, under the statute, a court has discretion to award fees and costs to either party so "long as the fee claimant has achieved 'some degree of success on the merits.'"  *Id.* at 2152 (quoting *Ruckelshaus v. Sierra Club*, 463 U.S. 680, 694 (1983)).

The Court reached this conclusion based in large part on *Ruckelshaus*.  In *Ruckelshaus*, the Court had interpreted § 307(f) of the Clean Air Act, which authorized a court to award fees "'whenever it determines that such an award is appropriate.'"  *Id.* at 2157 (quoting 42 U.S.C. § 7607(f)).

> We began by noting that because nothing in § 307(f)'s text "clear[ly] show[ed]" that Congress meant to abandon the American Rule, fee claimants must have achieved some litigating success to be eligible for a fees award under that section.  We then concluded that by using the less stringent "whenever . . . appropriate" standard instead of the traditional "prevailing party" standard, Congress had "expand[ed] the class of parties eligible for fees awards from prevailing parties to partially prevailing parties – parties achieving some success, even if not major success."  We thus held "that, absent some degree of success

United States District Court
For the Northern District of California

on the merits by the claimant, it is not 'appropriate' for a federal court to award attorney's fees under § 307(f)."

*Id.* at 2157-58.

The *Hardt* Court concluded that

> *Ruckelshaus* lays down the proper markers to guide a court in exercising the discretion that § 1132(g)(1) grants. As in the statute at issue in *Ruckelshaus*, Congress failed to indicate clearly in § 1132(g)(1) that it "meant to abandon historic fee-shifting principles and intuitive notions of fairness." Accordingly, a fees claimant must show "some degree of success on the merits" before a court may award attorney's fees under § 1132(g)(1). A claimant does not satisfy that requirement by achieving "trivial success on the merits" or a "purely procedural victor[y]," but does satisfy it if the court can fairly call the outcome of the litigation some success on the merits without conducting a "lengthy inquir[y] into the question whether a particular party's success was 'substantial' or occurred on a 'central issue.'

*Id.* at 2158.

### 2.   *Hummell* Factors

In the wake of *Hardt*, the Ninth Circuit has emphasized that "[o]nly after passing through the 'some degree of success on the merits' door is a claimant entitled to the district court's discretionary grant of fees under § 1132(g)(1)." *Simonia v. Glendale Nissan/Infiniti Disability Plan*, 608 F.3d 1118, 1121 (9th Cir. 2010). But, even after that door has been passed, a court still has discretion in deciding whether to award fees. Five factors – known as the *Hummell* factors – traditionally guide that decision:

> (1) the degree of the opposing parties' culpability or bad faith; (2) the ability of the opposing parties to satisfy an award of fees; (3) whether an award of fees against the opposing parties would deter others from acting under similar circumstances; (4) whether the parties requesting fees sought to benefit all participants and beneficiaries of an ERISA plan or to resolve a significant legal question regarding ERISA; and (5) the relative merits of the parties' positions.

*Id.*

### 3.   *Hensley* Analysis

If a fee claimant passes both the *Hardt* and *Hummell* requirements, then courts will typically apply a *Hensley* analysis, *see Hensley v. Eckerhart*, 461 U.S. 424 (1983), to determine the amount of fees that should be awarded. *See D'Emanuele v. Montgomery Ward & Co.*, 904 F.2d 1379, 1382

United States District Court

For the Northern District of California

(9th Cir. 1990) (recognizing that § 1132(g)(1) "does not limit attorney's fees to a 'prevailing party'" but stating that that "distinction does not affect the applicability of *Hensley* to the calculation of an attorney's fee award under ERISA"); *see also McElwaine v. US West, Inc.*, 176 F.3d 1167, 1173 (9th Cir. 1999) (stating that "attorney fees under § 1132(g)(1) are calculated using a hybrid lodestar/multiplier approach").

B.    <u>Some Degree of Success on Merits</u>

    1.    <u>Count I</u>

        As noted above, for Count I, the Court held that the Defendant Plan had violated ERISA's notice requirements but that the normal remedy – *i.e.*, a remand to the plan administrator so that it could identify the relevant plan provision – would be a useless formality because, if only through the litigation, it was clear that Mr. Barnes's claim for benefits had been denied based on § 3.4(a) of the plan.

        The Defendant Plan argues that, with respect to Count I, Mr. Barnes did not achieve some degree of success on the merits but rather obtained only a trivial success on the merits or a purely procedural victory which, under *Hardt*, is not enough to give rise to a fee award.

        Because the Court *would* have ordered a remand but did not only because of the circumstances, it is fair to frame the issue as whether a remand order without more (*e.g.*, without an order instructing benefits to be awarded) is enough to constitute some success on the merits.  This is an issue that the Supreme Court in *Hardt* expressly declined to consider.  *See Hardt*, 130 S. Ct. at 2159 (stating that "we need not decide today whether a remand order, without more, constitutes 'some success on the merits'").

        Contrary to what the Defendant Plan argues, Mr. Barnes's victory on Count I cannot be deemed purely procedural.  Those district courts that have defined the term "purely procedural victory" have indicated that such a "victory would involve success on a procedural as opposed to a substantive issue.  For example, winning a motion for class certification or a motion to intervene would constitute a purely procedural victory because such a success does not bring the victorious party any closer to its desired relief."  *Taaffe v. Life Ins. Co.*, 769 F. Supp. 2d 530, 540-41 (S.D.N.Y. 2011); *see also Olds v. Retirement Plan of Int'l Paper Co.*, No. 09-0192-WS-N, 2011 U.S. Dist.

United States District Court

For the Northern District of California

1    LEXIS 59329, at *8 (S.D. Ala. June 1, 2011) (stating that "[p]rocedural victories are those a party

2    obtains in the course of the litigation but that do not result in any success on the litigated claim

3    itself[;] [p]rocedural remedies, in contrast, follow a substantive victory, which victory necessarily

4    reflects some degree of success on the merits of the litigated claim").  *See, e.g.*, *Jones v.*

5    *Metropolitan Life Ins. Co.*, 845 F. Supp. 2d 1016, 1033 (N.D. Cal. 2012) (Ware, J.) (concluding that

6    Ninth Circuit's holding that lower court had erred in applying Federal Rule of Civil Procedure 54(d)

7    by requiring each party to bear its own fees before the 14-day time for filing a fee motion had

8    expired was a purely procedural victory).

9        Admittedly, in *Duncan v. Harford Life & Accident Insurance Co.*, No. 2:11-cv-01536-GEB-

10   CKD, 2013 U.S. Dist. LEXIS 59624 (E.D. Cal. Apr. 25, 2013), a California district court did seem

11   to characterize a remand (so that the plan could conduct a second, independent review) as a purely

12   procedural victory.  *See id.* at *4, 6.  But, as the Alabama district court in *Olds* explained, procedural

13   *remedies* should not be confused with procedural *victories*.  "Procedural victories are those a party

14   obtains in the course of the litigation but that do not result in any success on the litigated claim itself.

15   Procedural remedies, in contrast, follow a substantive victory, which victory necessarily reflects

16   some degree of success on the merits of the litigated claim."  *Olds*, 2011 U.S. Dist. LEXIS 59329, at

17   *8.  The determination of whether to remand after a finding of error based on the merits is a

18   procedural remedy rather than a procedural victory.

19       The court in *Olds* also gave a good explanation as to why a remand for further administrative

20   proceedings should not be considered a purely procedural victory *or* even a trivial success:

21           [A] plaintiff has experienced "some degree of success on the merits"
             when he presents a claim that the defendant violated his rights and the
22           court rules that the defendant did violate those rights.  That is precisely
             what occurred here: among other arguments, the plaintiff claimed that
23           the Plan violated his statutory right to a full and fair review, and the
             Court held that the Plan did indeed violate that right.
24
                 That the *relief* the plaintiff received on this meritorious claim
25           is a full and fair administrative review rather than a guaranteed award
             of benefits at the judicial or administrative level may speak to the
26           quantum of his success on the merits of his claim, but it does not
             convert his substantial success on that claim into failure or trivial
27           success.

28

United States District Court

For the Northern District of California

*Id.* at \*6-7 (emphasis in original).  *Compare Jones v. Metropolitan Life Ins. Co.*, 845 F. Supp. 2d at 1033 (Ware, J.) (deeming the Ninth Circuit's order for a remand to the plan administrator to determine the amount of benefits a trivial success but only because, prior to the appeal, the plaintiff had already submitted the issue of the amount of benefits to the plan administrator (in the wake of the district court's summary judgment order)).

The bottom line is that, in the wake of *Hardt*, "[l]ower court cases . . . have usually concluded that a remand to the defendant to conduct further administrative proceedings is not a merely procedural victory [or trivial success] but reflects a sufficient degree of success on the merits to qualify for an award of fees and expenses." *Olds*, 2011 U.S. Dist. LEXIS 59329, at \*5 (citing cases); *see also Scott v. PNC Bank Corp. v. Affiliates Long Term Disability Plan*, No. WDQ-09-3239, 2011 U.S. Dist. LEXIS 69693, at \*10 (D. Md. June 28, 2011) (finding "more persuasive" those cases "conclud[ing] that a remand alone constitutes success on the merits").  The only circuit court that appears to have expressed an opinion on the issue has held such.  *See McKay v. Reliance Standard Life Insurance Co.*, 428 Fed. Appx. 537, 547 (6th Cir. 2011) (concluding that plaintiff achieved some degree of success simply by getting a remand; "[i]ndeed, McKay was just like the *Hardt* claimant in that he 'persuaded the District Court to find that the plan administrator . . . failed to comply with the ERISA guidelines' and that, as a result, he 'did not get the kind of review to which [he] was entitled under the applicable law'").  This Court agrees.

Accordingly, the Court concludes that, for Count I, Mr. Barnes has adequately established some success on the merits.

2.    Count II

As noted above, for Count II, the Court held that (1) the Defendant Plan's interpretation that § 3.4(a) applied to lump-sum payees was reasonable and that (2) any request for relief on behalf of deferred annuitants based on § 3.4(d)(3) was moot in light of the Defendant Plan's stipulation that all annuitants, immediate and deferred alike, were entitled to benefits under § 3.4(d)(3).

Mr. Barnes does not make any attempt argue success based on the claims of lump-sum payees.  However, he does assert that he achieved some success with respect to the claims of deferred annuitants.  According to Mr. Barnes, his actions led to Judge Patel's giving a preview on

United States District Court

For the Northern District of California

1   how she might construe § 3.4(d)(3), *see* Docket No. 240 (Order at 7-8), and her inclusion of deferred

2   annuitants as part of the class (based on that construction); this then served as a catalyst to the

3   Defendant Plan's decision to have the BPC issue a formal interpretation on the plan regarding the

4   treatment of deferred annuitants.  That interpretation was favorable to deferred annuitants (*i.e.*, they

5   were entitled to both a redetermined ATB and a cash balance under § 3.4(d)(3)) and reversed the

6   Defendant Plan's prior interpretation that § 3.4(d)(3) covered immediate annuitants, but not deferred

7   annuitants.

8          As a preliminary matter, the Court takes note that Mr. Barnes essentially asserts a catalyst

9   theory.  *See Kenseth v. Dean Health Plan, Inc.*, 784 F. Supp. 2d 1081, 1094 (W.D. Wisc. 2011)

10   (stating that "[t]he catalyst theory 'posits that, for purposes of determining an award of attorneys'

11   fees, a plaintiff prevails if he achieves the desired outcome of litigation even if it results from a

12   voluntary change in the defendant's conduct'"), *vacated on other grounds*, No. 11, 2013 U.S. App.

13   LEXIS 12083 (7th Cir. June 13, 2013).  In *Buckhannon Board & Care Home v. West Virginia*

14   *Department of Health & Human Resources*, 532 U.S. 598 (2001), the Supreme Court rejected the

15   catalyst theory where a request for fees had been made under 42 U.S.C. § 1988 (and not §

16   1132(g)(1) as here).  More specifically, the Supreme Court held that a plaintiff is not a prevailing

17   party under the statute even if the lawsuit has brought about a voluntary change in the defendant's

18   conduct because, to be a prevailing party for purposes of § 1988, a plaintiff must secure some

19   material alteration in the legal relationship between the parties (*e.g.*, a judgment on the merits, a

20   settlement agreement enforced through a court-ordered consent decree).  In other words, the catalyst

21   theory was rejected because "[i]t allows [a fee] award where there is *no judicially sanctioned change*

22   in the legal relationship of the parties"; "[a] defendant's voluntary change in conduct, although

23   perhaps accomplishing what the plaintiff sought to achieve by the lawsuit, lacks the *necessary*

24   *judicial imprimatur* on the change."  *Id.* at 605 (emphasis added).

25          However, the ERISA fee provision under consideration in the instant case (§ 1132(g)(1))

26   does not include a prevailing party requirement.  Courts have disagreed as to whether a catalyst

27   theory is permissible under of § 1132(g)(1) after *Buckhannon*.  *See Feldman's Med. Ctr. Pharm.,*

28   *Inc. v. CareFirst, Inc.*, 898 F. Supp. 2d 883, 897-98 (D. Md. 2012) (citing cases).  Most courts,

United States District Court

For the Northern District of California

however, have assumed that it is still viable. *See, e.g.*, *Boyle v. International Bhd. of Teamsters Local 863 Welfare Fund*, No. 11-3202 (SRC), 2012 U.S. Dist. LEXIS 170330, at *28 (D.N.J. Nov. 30, 2012) (noting that no circuit court had yet decided "whether *Buckhannon*'s rejection of the catalyst theory extends to the more permissive fee shifting provision in ERISA" and that "courts that have squarely addressed the question have expressed doubt about the catalyst theory's place . . . but have generally assumed the theory's continuing viability"). In *Feldman's*, the district court so assumed, pointing to supporting authority:

> While *Buckhannon* barred use of the catalyst theory in "prevailing party" statutes, several cases including notably a Fourth Circuit decision [as well as a D.C. and Eleventh Circuit decisions], hold that the catalyst theory survived *Buckhannon* for environmental statutes allowing for fees "whenever appropriate." Like ERISA § 1132(g)(1) after *Hardt*, the "whenever appropriate" fee provisions of these statutes are governed by the *Ruckelshaus* "some degree of success on the merits" standard. These cases together lend support to the broader position that "the catalyst theory . . . survives under fee-shifting statutes that do not contain a prevailing party requirement."

*Id.* at 898-99. *But see Boyle*, 2012 U.S. Dist. LEXIS 170330, at *28 (concluding that "ERISA does not permit fee shifting under the catalyst theory" because "[t]he Supreme Court's requirement that plaintiffs show some success 'on the merits' seems to presume, at a minimum, that this success be *before the court*"; adding that "the 'some degree of success' standard 'is more lenient with respect to *how much* a party must prevail' but . . . 'it is difficult to see why it would change the *type* of result that qualifies as success, that is, whether the plaintiff achieves relief through a court order or voluntary cessation of conduct'") (emphasis in original).

The Court finds the analysis in *Feldman's* more persuasive than that in *Boyle* and, accordingly, concludes that the catalyst theory remains viable for purposes of § 1132(g)(1). The availability of the theory accords with the broader sweep of the fee-shifting language of § 1132(g)(1).

Having made this conclusion, the Court must then evaluate whether, in the instant case, Mr. Barnes's actions in the lawsuit were in fact a catalyst for the Defendant Plan's decision to have the BPC render a formal interpretation on the plan with respect to lump-sum payees and deferred annuitants.

United States District Court

For the Northern District of California

In *Buckhannon*, Justice Ginsburg, in her dissent, noted that

> [t]he array of federal court decisions applying the catalyst rule suggested three conditions necessary to a party's qualification as "prevailing" short of a favorable final judgment or consent decree. A plaintiff first had to show that the defendant provided "some of the benefit sought" by the lawsuit. Under most Circuits' precedents, a plaintiff had to demonstrate as well that the suit stated a genuine claim, i.e., one that was at least "colorable," not "frivolous, unreasonable, or groundless." Plaintiff finally had to establish that her suit was a "substantial" or "significant" cause of defendant's action providing relief. In some Circuits, to make this causation showing, plaintiff had to satisfy the trial court that the suit achieved results "by threat of victory," not "by dint of nuisance and threat of expense."

*Buckhannon*, 532 U.S. at 627-28; *see also Feldman*, 898 F. Supp. 2d at 899 (identifying three thresholds under the catalyst theory).

Here, the critical question is whether Mr. Barnes's suit was a substantial or significant cause of the Defendant Plan's decision to have the BPC issue a formal interpretation of the plan with respect to lump-sum payees and deferred annuitants which concluded with a favorable outcome for deferred annuitants. According to the Defendant Plan, "the catalyst for the BPC 2011 Determination was not Judge Patel's reading of Section 3.4(d)(3), but rather the fact that Plaintiff was pursuing these claims without having exhausted and without the benefit of the BPC interpretation of the Plan." Opp'n at 13 n.8. But this argument misses the point. Even if the catalyst was Mr. Barnes's purported failure to exhaust, that still means that it was Mr. Barnes's suit that precipitated the BPC to interpret the plan.

To the extent the Defendant Plan argues that this Court implicitly rejected Mr. Barnes's suit being a catalyst in its summary judgment order, *see* Opp'n at 13 n.8, it is not correct. In the summary judgment order, the Court simply stated that "it is far from clear that the third interpretation [of § 3.4(d)(3)] was rendered as a response to Judge Patel's order." Docket No. 309 (Order at 23). This was a statement made in the context of discussing whether the third interpretation was made in bad faith. That does not detract from the fact that Mr. Barnes's lawsuit precipitated *all* of the interpretations of § 3.4(d)(3) – *i.e.*, the Defendant Plan had no occasion to interpret § 3.4(d)(3) but for Mr. Barnes's lawsuit.

**United States District Court**

For the Northern District of California

1    The more important problem identified by the Defendant Plan is that, *even if* Mr. Barnes's

2    lawsuit did serve as a catalyst for its actions, Mr. Barnes should not be rewarded now because he

3    never put § 3.4(d)(3) at issue during the administrative proceedings and so the Defendant Plan did

4    not have an opportunity during administrative proceedings to render an interpretation of § 3.4(d)(3).

5    *See* Docket No. 309 (Order at 13) (noting that "Mr. Barnes did not bring up § 3.4(d)(3) at the outset

6    of the lawsuit [in January 2008][;] [r]ather, the first time that he raised § 3.4(d)(3) as an issue was on

7    January 26, 2010, when he moved to file an amended complaint").   The Defendant Plan argues that,

8    if Mr. Barnes had raised § 3.4(d)(3) during the administrative proceedings, then the BPC would have

9    rendered its interpretation favorable to deferred annuitants[4] and then there would be no basis for fees

10   because a plaintiff cannot get fees for exhausting administrative remedies.  *See, e.g.*, *Dishman v.*

11   *UNUM Life Ins. Co. of Am.*, 269 F.3d 974, 987 (9th Cir. 2001) (stating that § 1132(g)(1) "was not

12   meant to reimburse claimants for legal expenses 'incurred during administrative proceedings prior to

13   suit,' even though such proceedings as 'necessary and valuable'[;] [p]ut simply, ERISA does not

14   'allow[] for attorneys' fees for the administrative phase of the claims process'"); *Cann v.*

15   *Carpenters' Pension Trust Fund*, 989 F.2d 313, 316 (9th Cir. 1993) (construing § 1132(g)(1) "as

16   limiting the award to fees incurred in the litigation in court," not in administrative proceedings).

17   This argument as raised by the Defendant Plan is addressed in more detail below.  For now, the

18   Court simply makes the finding that Mr. Barnes achieved some degree of success on the merits

19   because his actions did in fact serve as a catalyst.

20   ///

21   ///

22   ///

23

24        [4] The Defendant Plan ignores the first two interpretations of § 3.4(d)(3) that were offered in
this litigation because they were not provided by the BPC specifically.  But, as the Court indicated
25   in its summary judgment order, it is fair to impart these interpretations to the Defendant Plan – even
     if not offered by the BPC specifically.  *See* Docket No. 309 (Order at 20-21) (stating that it "seems
26   artificial – not to mention unfair – to say that the first and second interpretations are . . .
     meaningless" because not formally issued by the BPC: "[l]itigation counsel easily could have run
27   the first interpretation by the BPC" and "Ms. Francis could have testified in her deposition that she
     needed to confer with the BPC"; also noting that "Ms. Francis never corrected her deposition
28   testimony").

C.     _Hummell_ Factors

As noted above, even where a plaintiff shows some success on the merits under _Hardt_, a court still has discretion in deciding whether to award fees, taking into account the _Hummell_ factors, namely:

> (1) the degree of the opposing parties' culpability or bad faith; (2) the ability of the opposing parties to satisfy an award of fees; (3) whether an award of fees against the opposing parties would deter others from acting under similar circumstances; (4) whether the parties requesting fees sought to benefit all participants and beneficiaries of an ERISA plan or to resolve a significant legal question regarding ERISA; and (5) the relative merits of the parties' positions.

_Id._

1.     Degree of Defendant's Culpability or Bad Faith

For Count I, Mr. Barnes argues that there is culpability because, had he been informed of the specific plan provision on which the Defendant Plan relied to deny him benefits (_i.e._, § 3.4(a)), then that would have likely have led him to § 3.4(d)(3), _see_ Docket No. 309 (Order at 9 (noting that "it is possible that, had the Defendant Plan cited to § 3.4(a), that would have led Mr. Barnes to § 3.4(d)(3)")), which then would have allowed him to effectively appeal the denial. This argument is not on point as it does not address Defendant's culpability or bad faith. Although the Defendant Plan did fail to cite the specific plan provision on which it relied, it did not fail to give any reason for its denial, nor was the reason provided for the denial conclusory or vague. Indeed, the Defendant Plan was fairly specific about the reason for denial – _i.e._, "because Mr. Barnes had taken a cashout of his ATB at the time of his first retirement, future benefits upon rehire would not 're-do' his ATB." Docket No. 309 (Order at 8) (noting that the Defendant Plan quoted the Benefits Binder). Because the Defendant Plan was fairly specific about the reason for denial, it is hard to say that the Defendant Plan intentionally or even recklessly violated ERISA's notice requirements. _See McPherson v. Employees' Pension Plan of Am. Re-Ins. Co._, 33 F.3d 253, 256-57 (3d Cir. 1994) (noting that "bad faith normally connotes an ulterior motive or sinister purpose" but that "[a] losing party may be culpable . . . without having acted with an ulterior motive"; adding that culpable conduct in the civil context "is commonly understood to mean conduct that is 'blameable; censurable; . . . at fault'" and "normally involves something more than simple negligence"); _see also_

18

*Eddy v. Colonial Life Ins. Co. of Am.*, 59 F.3d 201, 210 (D.C. Cir. 1995) (suggesting that culpability would require some intentional or reckless conduct).

As for Count II, Mr. Barnes asserts that there is culpability because the Court found that the multiple interpretations of § 3.4(d)(3) warranted abuse-of-discretion review tempered by slight skepticism. But even if there is *some* culpability, that does not mean that this factor weighs strongly in Mr. Barnes's favor. Indeed, the fact that the Court decided to apply only slight skepticism indicates that the degree of culpability is relatively low, particularly since its initial interpretation favored Mr. Barnes.

2.    Ability of Defendant to Satisfy a Fee Award

Mr. Barnes argues that this factor weighs in its favor because AT&T clearly has sound financial standing as reflected in its 2012 annual report to investors. In response, the Defendant Plan states that the money to pay for fees will come not from AT&T but rather from the Defendant Plan. However, the Defendant Plan goes on to admit that it would be able to pay fees, and thus this factor weighs in Mr. Barnes's favor. Although the Defendant Plan suggests that a fee award would adversely effect future benefits for plan participants, *see* Opp'n at 17 n.13 (stating that, although Mr. Barnes "may argue that a $1.5 million depletion would not result in any decrease to current accrued or vested benefits, which must be funded by AT&T as the employer, that argument overlooks the fact that the Plan uses its assets to pay for future benefits not yet accrued" and thus his "fee demand seeks to reduce the amounts available for future benefits by almost $1.5 million"), the fact remains that the Defendant Plan is able to satisfy the fee award requested.

3.    Deterrent Effect of Fee Award

This factor evaluates whether an award of fees against the Defendant Plan would deter others from acting under similar circumstances. Because the Court concludes that the Defendant Plan has acted at best with a low degree of culpability, an award of fees would likely have a small deterrent effect.[5]

---

[5] The Court acknowledges that, for this factor, the Defendant Plan takes the opportunity to raise the exhaustion issue again – *i.e.*, that if the Court awards fees to Mr. Barnes, then he will be rewarded for not exhausting. The exhaustion issue, however, is more appropriately considered as a part of the *Hensley* analysis. It does not inform whether those in the Plan's position would be

United States District Court

For the Northern District of California

4.      Benefit for All Plan Participants/Beneficiaries or Resolution of Significant Legal
        Question Regarding ERISA

There is no real dispute that the instant case did not involve the resolution of a significant legal question regarding ERISA.  Instead, the parties focus on whether Mr. Barnes sought to benefit all participants and beneficiaries of an ERISA plan.  At least one circuit court has characterized the benefit-to-others factor as an objective factor rather than a subjective one.  *See Eddy*, 59 F.3d at 209 (D.C. Circuit stating that "benefit-to-others is an objective factor, and the subjective intent of the plaintiff in filing suit is irrelevant").  Furthermore, at least one circuit court has stated that the benefit-to-others consideration appears to be "a codification of the common fund doctrine of the common law," which "permits the courts to award fees to a party recovering a fund or property for the benefit of others in addition to himself out of the fund or property so recovered."  *Armistead v. Vernitron Corp.*, 944 F.2d 1287, 1304 (6th Cir. 1991).

The Defendant Plan contends that this factor weighs in its favor because Mr. Barnes sought to benefit a very small group of participants – *i.e.*, annuitants – and the actual number of annuitants who fit the class definition was only three, only one of which was actually eligible for benefits under § 3.4(d)(3).[6]  *See* Stone Decl. ¶¶ 3-4.  This argument is not convincing.  Just because the number of others who might benefit or actually benefitted was small does not detract from the fact that Mr. Barnes did seek to benefit others and not just himself.  Indeed, starting on January 26, 2010, Mr. Barnes sought to litigate the case as a class action.  *See* Docket No. 39 (motion).  *Compare Oster v. Barco of Cal. Employees' Ret. Plan*, 869 F.2d 1215, 1222 (9th Cir. 1988) (stating that the fourth factor weighs against awarding fees because, in bringing the appeal, plaintiff "was not seeking to benefit all participants" but rather "was attempting to achieve a one-time benefit for himself, regardless of the impact such a payment might have on the future beneficiaries of the Plan").

---

deterred.

[6] Mr. Barnes has objected to the *calculation* of the benefits for the deferred annuitants, but he does not appear to dispute that only three deferred annuitants could be a part of the class.

United States District Court
For the Northern District of California

5.      Relative Merits of Parties' Positions

This issue has basically been addressed above in conjunction with the analysis of "some degree of success on the merits."

6.      Summary

In the instant case, the critical factors seem to the first and fifth – *i.e.*, the degree of culpability on the part of the Defendant Plan and the relative merits of the parties' positions.  On balance, the Court concludes that the factors sufficiently weigh in favor of an award of fees, although the appropriate amount is certainly subject to dispute.

D.      *Hensley* Analysis

With respect to the amount of fees, *Hensley* provides the guiding analysis.  Under *Hensley*, a

> district court begins its calculation of fees by multiplying the number of hours reasonably spent on the litigation by a reasonable hourly rate. The resulting number is frequently called the "lodestar" amount.  In determining the appropriate number of hours to be included in a lodestar calculation, the district court should exclude hours "that are excessive, redundant, or otherwise unnecessary."

*McCown v. City of Fontana*, 565 F.3d 1097, 1102 (9th Cir. 2009).  A district court then makes a two-part inquiry: "'First, did the plaintiff fail to prevail on claims that were unrelated to the claims on which he succeeded?  Second, did the plaintiff achieve a level of success that makes the hours reasonably expended a satisfactory basis for making a fee award?'"  *Id.* at 1103 (quoting *Hensley*, 461 U.S. at 434).  "A plaintiff is not eligible to receive attorney's fees for time spent on unsuccessful claims that are unrelated to a plaintiff's successful . . . claim."[7]  *Id.*  But

_____

[7] In *Hensley*, the Supreme Court indicated that claims are related where they "involve a common core of facts or [are] based on related legal theories."  *Hensley*, 461 U.S. at 435.  "[C]ourts evaluating relatedness have considered whether the unsuccessful claims were presented separately, whether testimony on the successful and unsuccessful claims overlapped, and whether the evidence concerning one issue was material and relevant to the other issues."  *Thorne v. City of El Segundo*, 802 F.2d 1131, 1141 (9th Cir. 1986).  *See, e.g.*, *Schwarz v. Secretary of Health & Hum. Servs.*, 73 F.3d 895, 903-04 (9th Cir. 1995) (upholding district court's conclusion that claims were unrelated because, *e.g.*, they were based on distinct facts); *Hoye v. City of Oakland*, No. C 07-06411 CRB, 2012 U.S. Dist. LEXIS 142038, at *13 (N.D. Cal. Oct. 1, 2012) ("conclud[ing] that the as-applied challenge and the facial challenge – although both generally about the Ordinance – were unrelated").  "If it is impossible to isolate the truly unrelated claims from those related claims, the district court should instead reflect that limited success in *Hensley*'s second step: the significance of the overall relief in relation to the hours reasonably expended on the litigation."  *Webb v. Sloan*, 330 F.3d 1158, 1169 (9th Cir. 2003).

United States District Court
For the Northern District of California

> in a lawsuit where the plaintiff presents different claims for relief that "involve a common core of facts" or are based on "related legal theories," the district court should not attempt to divide the request for attorney's fees on a claim-by-claim basis.  Instead, the court must proceed to the second part of the analysis and "focus on the significance of the overall relief obtained by the plaintiff in relation to the hours reasonably expended on the litigation."

*Id.*; *see also Dang v. Cross*, 422 F.3d 800, 813 (9th Cir. 2005) (stating that, under a *Hensley* analysis, where unsuccessful and successful claims are related, then the court must evaluate the significance of the overall relief obtained by the plaintiff in relation to the hours reasonably expended on the litigation).

In the instant case, the Defendant Plan not does attack the lodestar as claimed by Mr. Barnes.  Rather, its focus is on Mr. Barnes's limited success.  With respect to limited success, the Defendant Plan does not contend that the unsuccessful claims were unrelated to the successful claims.  Instead, its only argument is that the fees requested are not justified in light of the partial success achieved.

Because the Defendant Plan does not make any argument that any of the unsuccessful claims are unrelated to the successful claims, the Court considers only the second prong of *Hensley*.  With respect to this prong, the Court agrees that there should be a reduction of fees because of the limited success.  There is no dispute that Mr. Barnes achieved only limited success because, although he prevailed on Count I and part of Count II (deferred annuitants), he did not prevail on Counts III through V and part of Count II (*i.e.*, lump-sum payees).  And the hours spent on the litigation (more than 3,000) were not "reasonably necessary to obtain the relief that was ultimately obtained" by Mr. Barnes, *Velez v. Wynne*, 220 Fed. Appx. 512, 513 (9th Cir. 2007) – *i.e.*, a remand that was not ordered because it was unnecessary under the circumstances (Count I) and an interpretation of the plan favorable to deferred annuitants as they would now get cash balance benefits (and not just an ATB) (Count II).

The Court first takes into account the time frame for which fees may be recovered.  For Count I, Mr. Barnes cannot credibly claim fees incurred after February 5, 2010, because, on that date, the Defendant Plan gave notice to him (through a motion for summary judgment) that it was relying on § 3.4(a) of the plan as the basis for the denial of benefits.  *See* Docket No. 47 (Def.'s Mot. for Summ. Judg. at 4, 14) (highlighting § 3.4(a) and arguing that "[t]he plain language of the plan

United States District Court

For the Northern District of California

1    provisions in Section 3.4(a) . . . expressly prohibit a pension calculation for a rehired employee that

2    ignores a prior cashout by the employee").  Thus, the ERISA notice violation asserted in Count I

3    was essentially remedied as of February 5, 2010.

4         As for Count II, the Court does not agree with the Defendant Plan's argument that none of

5    the fees should count because there was never exhaustion of the deferred annuitants' claim for

6    benefits.  *See* pages 16-17, *supra*.  Notably, when Mr. Barnes moved to modify Judge Patel's class

7    certification order to add annuitants to the class, the Defendant Plan opposed, in part because of a

8    lack of exhaustion.  *See* Docket No. 218 (Opp'n at 3).  In reply, Mr. Barnes argued that there was no

9    exhaustion problem because, as a general matter, absent class members do not need to exhaust so

10    long as the named plaintiff has exhausted (which he had), and his claim for relief as a lump-sum

11    payee was still typical of a claim for relief by a deferred annuitant – *i.e.*, both lump-sum payees and

12    deferred annuitants were denied full benefits under § 3.4(d)(3) (with lump-sum payees being denied

13    the redetermined ATB and deferred annuitants being denied the cash balance benefit).  *See* Docket

14    No. 224 (Reply at 1).

15         While Judge Patel did not make any express ruling on the exhaustion issue in her order

16    granting Mr. Barnes's motion to modify the class definition, the fact that she granted the motion in

17    the face of the Defendant Plan's exhaustion argument implies that she did not consider exhaustion a

18    bar.  Moreover, the Defendant Plan apparently viewed the exhaustion issue as having been resolved

19    since it did not move for a dismissal on that basis.  Nor did it seek clarification.  To the extent the

20    Defendant Plan argues that Judge Patel indicated at the hearing that she considered exhaustion an

21    affirmative defense which could be brought up later in the proceedings, that is not clear from the

22    record.  The hearing transcript reflects that defense counsel raised before Judge Patel the argument

23    that *a claim for a special ATB* had never been exhausted – an argument applicable to a different

24    motion made by Mr. Barnes which was heard on the same date (*i.e.*, a motion to amend to add, *inter*

25    *alia*, allegations related to a failure to pay a special ATB).  *See* Docket No. 192 (motion); *see also*

26    Docket No. 245 (Tr. at 13-14) (stating that Mr. Barnes should plead a separate cause of action for

27    the special ATB and that the Defendant Plan was "going to take issue with it [b]ut you'll reserve that

28    in your answer[;] [w]e're not going to have any more motions to dismiss").  Judge Patel never

United States District Court

For the Northern District of California

1    stated, either at the hearing or in her order on the motion to modify, that she thought the exhaustion

2    defense with respect to the claim by annuitants – in particular, for a cash balance benefit – should be

3    deferred until a later juncture in the proceedings.

4         That being said, even if failure to exhaust (as a predicate for fees) does not entirely bar the

5    claim of deferred annuitants, that does not change the fact that annuitants did not become a part of

6    this case until January 26, 2010, when Mr. Barnes moved to amend to add class allegations (which

7    implicitly included not only lump-sum payees but also annuitants).  Thus, fees incurred prior to

8    January 26, 2010, for deferred annuitants are not recoverable herein.

9         Moreover, even though deferred annuitants became a part of the case on or about January 26,

10   2010, that was only with respect to a claim for an *ATB* only.  The *cash balance benefit* for deferred

11   annuitants did not become an issue in this case until January 21, 2011 (almost a year later), when

12   Mr. Barnes filed his reply brief in support of the motion to modify the class certification order.[8]

13   Thus, even if deferred annuitants did not have to exhaust to get their rights litigated before this

14   Court, the underlying purpose of exhaustion must be afforded consideration in calculating awardable

15   fees.  The point of exhaustion is to give an ERISA defendant the opportunity to correct any

16   deficiency at the administrative stage so as to render any litigation unnecessary.  Here, the

17   Defendant Plan was not given notice of the specific deficiency – *i.e.*, a failure to pay deferred

18   annuitants a cash balance benefit (as opposed to an ATB) – until January 21, 2011.  Thus, for Count

19   II (deferred annuitants), it would not be fair to award fees against the Defendant Plan which were

20   incurred before January 21, 2011.  That is, such fees cannot be deemed "reasonably necessary to

21   obtain the relief that was ultimately obtained."  *Velez*, 220 Fed. Appx. at 513.  As for the end date,

22   Mr. Barnes has limited his request to fees incurred as of August 31, 2011, the date that the BPC

23   rendered its formal interpretation of § 3.4(d)(3).

24        Accordingly, at this juncture, fees that were reasonably necessary to obtain the relief that was

25   ultimately obtained by Mr. Barnes include *at most* (1) fees incurred in prosecuting Count I prior to

26

27        [8] Mr. Barnes only prevailed (via catalyst theory) with respect to the cash balance benefit, and
     not the ATB, because the Defendant Plan never took the position (at any point in the litigation) that

28   deferred annuitants were not entitled to a full ATB.

United States District Court

For the Northern District of California

1   February 5, 2010, and (2) fees incurred in prosecuting Count II between January 21, 2011, and

2   August 31, 2011.  Because the fees in time period (1) above include time spent on claims other than

3   Count I and the fees in time period (2) above include time spent on claims other than Count II

4   (deferred annuitants), an allocation between time spent on successful and unsuccessful claims or

5   some evaluation of the hours spent in light of results obtained must be made.  Unfortunately for the

6   Court, the billing records for Mr. Barnes's attorneys do not shed any light as to how to parse out fees

7   related to Count I or Count II (deferred annuitants) from the other claims.

8           Given this situation, the Court orders the parties to provide supplemental briefing as to (1)

9   whether all fees incurred prior to February 5, 2010, were reasonably necessary to obtain the relief

10  that was ultimately obtained by Mr. Barnes for Count I; (2) whether all fees incurred between

11  January 21, 2011, and August 31, 2011, were reasonably necessary to obtain the relief that was

12  ultimately obtained by Mr. Barnes for Count II (deferred annuitants); and (3) in either event, what

13  reduction, if any, should be made with respect to each time period, particularly in light of the nature

14  of the claims on which Plaintiff obtained some success and the results obtained.  The Court advises

15  the parties that it expects both to address *each* of these three issues.  The supplemental briefing shall

16  be filed within two weeks after the date of this order.  The parties may stipulate to additional time if

17  necessary to ensure a complete review of the billing records.

18          As to the third issue, the Court makes the following observations regarding proportionality.

19  The main case cited by Mr. Barnes regarding proportionality is *Anderson v. AB Painting &*

20  *Sandblasting, Inc.*, 578 F.3d 542, 546 (7th Cir. 2009), an ERISA case.  The district court there was

21  concerned about the relationship between the actual damages ($6,500, including interest) and the

22  requested attorney's fees ($50,885.90).  The district court stated that the fee request was

23  disproportionate to the damages claimed and thus reduced fees to $10,000.  *See id.* at 544.

24          On appeal, the Seventh Circuit reversed and remanded for a new calculation of attorney's

25  fees.  It began by noting that,

26                      [b]ecause Congress wants even small violations of certain laws
                        to be checked through private litigation and because litigation is
27                      expensive, it is no surprise that the cost to pursue a contested claim
                        will often exceed the amount in controversy.  That is the whole point
28                      of fee-shifting – it allows plaintiffs to bring those types of cases

> because it makes no difference to an attorney whether she receives $ 20,000 for pursuing a $ 10,000 claim or $ 20,000 for pursuing  a $ 100,000 claim.  Fee-shifting would not "discourage petty tyranny" if attorney's fees were capped or measured by the amount in controversy.

*Id.* at 545.

The court acknowledged that "[s]ome of our cases have expressed concern where attorney's fees overshadowed the damages awarded, but only because some other element of the case did not seem reasonable." *Id.*  For example, in one case, "our concern was not so much with the amount of the fee as with the disparity between the number of hours billed and the seeming simplicity of the case (1,200 hours were spent pursuing a rolled-back odometer claim)." *Id.*  The court also acknowledged that it had previously stated "'increased reflection'" should be given before awarding a fee several times the amount of actual damages but added that this simply meant that "a comparatively large fee request raises a red flag." *Id.* at 546.  "[I]n many cases the amount in controversy and the complexity of the case will track with one another.  But small claims can be complex and large claims can be very straightforward.  So while a fee request that dwarfs the damages award might raise a red flag, measuring fees against damages will not explain whether the fees are reasonable in any particular case." *Id.*

The Seventh Circuit went on to state as follows:

> Reasonableness has nothing to do with whether the district court thinks a small claim was "worth" pursuing at great cost.  Fee-shifting statutes remove this normative decision from the court.  If a party prevails, and the damages are not nominal, then Congress has already determined that the claim was worth bringing.  The court must then assume the absolute necessity of achieving that particular result and limit itself to determining *whether the hours spent were a reasonable means to that necessary end*.
>
> For example, it is absolutely permissible to spend $100,000 litigating what is known to be a $ 10,000 claim if that is a reasonable method of achieving the result.  But it might not be a reasonable method.  Proportionality then, where useful at all, could alert the court to situations where we might expect that the same result could have been achieved more efficiently.  But if, for some reason, the hours expended were reasonable in a particular case, then so is the fee.

*Id.* (emphasis added).  Notably, the Seventh Circuit stated that obdurate conduct on the part of the defendant could be a reason why a fee request is high.  *See id.*

**United States District Court**

For the Northern District of California

1    Proportionality between a damages award and a fee request, however, is a *different* issue

2  from proportionality between the damages sought and damages obtained; the Ninth Circuit

3  addressed the latter in *McCown*, 565 F.3d at 1097.  There, the Ninth Circuit noted that the trial court

4  should have taken into account in its calculation of attorney's fees the fact that eight of the

5  plaintiff's nine related claims were dismissed at summary judgment.  *McCown*, 565 F.3d at 1104

6  (stating that, "[a]lthough the Supreme Court has disavowed a test of strict proportionality, it also

7  suggested that a comparison of damages awarded to damages sought is required").

8  E.        Costs

9    As for costs, for the reasons stated above, the Court rejects the Defendant Plan's argument

10  that they should not be awarded under a *Hardt* or *Hummell* analysis.  Because the Defendant Plan

11  did not make any challenge to costs under a *Hensley* analysis, the Court shall award all costs

12  requested unless it agrees with the Defendant Plan that the cost request is "unsupported because [Mr.

13  Barnes] has failed to produce evidence of the 'prevailing practice in a given community' for lawyers

14  to bill," *e.g.*, meals, travel, outside printing or copying, and so forth.  Opp'n at 21.

15    The Court does not find this final argument raised by the Defendant Plan persuasive.  It is

16  true that the declarations from Mr. Barnes's attorneys simply state that "'*we* customarily  pass on

17  [these costs] to our clients,'" Opp'n at 22 (emphasis added); thus, they do not address whether that is

18  the practice of the community, as required before there can be cost-shifting.  *See Trustees of the*

19  *Constr. Indus. & Laborers Health  Welfare Trust v. Redland Ins. Co.*, 460 F.3d 1253, 1258 (9th Cir.

20  2006) ("hold[ing] that reasonable charges for computerized research may be recovered as 'attorney's

21  fees' under § 1132(g)(2)(D) if separate billing for such expenses is 'the prevailing practice in the

22  local community").

23    Nevertheless, Mr. Barnes has cited one case in which a Northern District of California court

24  concluded that it is the prevailing practice in the community that the costs of computer-based legal

25  research, PACER fees, and postage are billed to the client.  *See* Mot. at 24 (citing *Langston v. North*

26  *Am. Asset Dev. Corp. Group Disability Plan*, No. C-08-02560 SI, 2010 U.S. Dist. LEXIS 12507, at

27  *27-28 (N.D. Cal. Jan. 20, 2010).  Furthermore, a decision from this District allowed for the costs of

28  copying, mailing, faxing, and legal research under 42 U.S.C. § 1988.  *See Mahach-Watkins v.*

*Depee*, No. C 05-1143 SI, 2009 U.S. Dist. LEXIS 101675, at *5-6 (N.D. Cal. Oct. 20, 2009). *Mahach-Watkins* is especially notable because, there, even though the plaintiff had not made any showing what the prevailing practice in the legal community was, Judge Illston stated that she had "adjudicated many fee and cost petitions, and [found] that attorneys routinely bill their clients for these types of expenses." *Id.* at *6.

Based on *Langston*, *Mahach-Watkins*, and this Court's experience with adjudication of fee and cost petitions, Mr. Barnes's request for costs is justified. Accordingly, Mr. Barnes is awarded his costs in the amount of $75,867.85.[9]

### III.   CONCLUSION

For the foregoing reasons, the Court grants Mr. Barnes's motion for attorney's fees and costs. Costs in the amount of $75,867.85 are awarded. As for fees, the Court defers a ruling on the specific amount until after the parties have filed supplemental briefs. The Court shall advise the parties if an additional hearing is needed after it has had an opportunity to review the supplemental briefs.

This order disposes of Docket No. 355.

IT IS SO ORDERED.

Dated: July 26, 2013

_____
EDWARD M. CHEN
United States District Judge

---

[9] The Court notes that, in his reply brief, Mr. Barnes asks for $77,063.55 in costs. *See* Reply at 15. However, he does not appear to have explained why additional costs were incurred since the time of his opening brief. Accordingly, the Court shall award only the costs requested in the opening brief.